# GOVERNMENT OF THE VIRGIN ISLANDS, Appellee
## v.
# HENRY CURTIS SAMPSON, Appellant

D.C. Crim. App. No. 1996/050

District Court of the Virgin Islands

Division of St. Croix

April 5, 2000

Jean-Robert Alfred, Esq., St. Croix, U.S.V.I., *for Appellant*

Maureen Phelan Cormier, Esq., St. Thomas, U.S.V.I., *for Appellee*

FINCH,[1] *Chief Judge*, MOORE, DIASE, Sitting by Designation.

## ORDER OF THE COURT

PER CURIAM

AND NOW this 5 day of April 2000, having considered the arguments and submissions of the parties, and for the reasons set forth in the Court's accompanying opinion of even date, it is hereby

ORDERED AND ADJUDGED that the rulings of the Territorial Court are AFFIRMED.

## OPINION OF THE COURT

PER CURIAM

The issues presented for review are: 1) whether there was sufficient evidence of premeditation to support a verdict of guilty on the charge of murder in the first degree; 2) whether the trial court erred in allowing a forensic pathologist to give an expert opinion as to whether the victim received reasonable and proper medical care in the hospital; 3) whether the trial court erred in restricting defense counsel from cross-examining the forensic pathologist about the reliability of his testimony in light of his employment with the hospital, and the possibility of negative

---

[1] The Honorable Raymond L. Finch became the Chief Judge of the District Court of the Virgin Islands on August 15, 1999.

consequences to the hospital if he testified that the medical care provided was unreasonable and improper; and 4) whether the trial court erred in denying appellant's motion for a new trial once it determined that juror number 7 had truthfully responded to voir dire questions, and was not subject to a presumption of bias. For the reasons stated below, we will affirm both appellant's convictions, and the denial of his motion for a new trial.

## I. FACTS

On June 17, 1995, Henry Curtis Sampson ["Sampson" or "appellant"] attended a wedding reception at Vialco with his wife, Carol Sampson ["Mrs. Sampson" or "the victim"] and their children. Although the facts are widely disputed, it appears that upon returning home, Mrs. Sampson asked her husband to return to the reception to help with the cleanup. Sampson left home, and had driven only a short distance when he says he saw the lights in the house suddenly go out. He stopped the truck, left his keys in the ignition, and returned home on foot through a path.

Upon arriving at his house, Sampson alleges that he heard his wife on the telephone "carrying on a sort of loving conversation with somebody." (Appendix to Brief of Appellant ["App."] at 100.) He listened quietly by the window for approximately twenty-five minutes as he learned that his wife had given $1,600.00 of his money to someone named Brian, who he contends was her boyfriend. When he'd heard enough of the conversation, he said "honey, open the door." (*Id.*) Mrs. Sampson did not open the door, so Sampson climbed through a window at the back of the house where he says he usually entered the home. Once inside, Mr. Sampson alleges that he and his wife sat down to talk and exchange ideas. This talk, says Sampson, revealed various acts of infidelity by both him and his wife.

At one point, Sampson says that he went to the bathroom, and when he returned, Mrs. Sampson was sitting on the sofa, and was "a little, you know, mad; real mad." (*Id.* at 111.) Sampson surmised that his wife "was a little intoxicated" after having drunk a cup of Ponche Cuba and brandy she brought from the reception. (*Id.*) In any event, Sampson alleges that Mrs. Sampson took a knife from behind a pillow on the sofa and attacked him "like a raging bull."

249

He responded by saying, "you know, honey, you got to stop. Honey, stop it; cool out; behave, you understand; stop." (*Id.* at 114.)

Sampson contends that he was angrily pursued by his wife with a knife, but the testimony of three neighbors suggests a different scenario. Two neighbors heard Mrs. Sampson tell her husband to stop for fear that he might kill her. A third neighbor testified that after the incident, Sampson told her that he had attacked his wife after overhearing her telephone conversation with Brian.

After the fight ended, neighbors found Mrs. Sampson's partially clad body lying in the grass covered in blood. She was taken by ambulance to the Governor Juan F. Luis Hospital where she was admitted at 12:02 a.m. on June 18, 1995. When Mrs. Sampson was examined by Dr. Alejandro Cebedo ["Dr. Cebedo"] in the emergency room, he testified that she was "in a semi-comfortable condition. . . . She was not crying; she was not screaming. She was just on the stretcher sitting up." (*Id.* at 22.) Dr. Cebedo examined her wounds, particularly the most serious one to the abdomen. After determining that her vital signs were stable, and that the inside cavity of the stomach had not been punctured, he sutured the wounds — which he believed were not life threatening. Later that day, Mrs. Sampson started to show signs of restlessness, but her condition was still considered stable. As such, Dr. Cebedo allowed her to drink liquids.

The restlessness continued into the next day, June 19th, and Dr. Cebedo was summoned to the hospital where, at about 5:30 a.m., he found Mrs. Sampson with a distended abdomen that was firm and rigid. An operating team was called, blood transfusions were begun, and at 7:00 a.m. Mrs. Sampson gave her consent to an operation. Mrs. Sampson passed away before the operating team arrived at the hospital, and was pronounced dead at 8:10 a.m.

Appellant was arrested and charged in the death of his wife. In a second amended information filed by the Government of the Virgin Islands ["government"] appellant was charged in Count One with murder in the first degree in violation of V.I. CODE ANN. tit. 14, §§ 921 and 922(a)(1), and in Count Two with possession of a deadly or dangerous weapon during the commission of a crime

of violence in violation of 14 V.I.C. § 2251(a)(2)(B).[2] A jury trial commenced on April 22, 1996, and on April 27th, appellant was found guilty on both counts. A Judgment of Conviction was entered against appellant on July 5, 1996, *nunc pro tunc* to May 24, 1996, and a timely notice of appeal was filed on May 30, 1996.

On June 21, 1996, appellant filed a Petition for Writ of Habeas Corpus, which the Territorial Court treated as a motion for a new trial on the basis of newly discovered evidence pursuant to Terr. Ct. R. 135.[3] (Memorandum Opinion of March 10, 1997 ["March 10th Op."] at 1 n.1.) On December 4, 1996, this Court granted the parties' motion for a stay of the appeal to give the Territorial Court an opportunity to hear appellant's motion for a new trial. The gravamen of appellant's motion was that he was denied his constitutional right to trial by a fair and impartial jury, specifically alleging that juror number seven had failed to disclose during voir dire that he was a peace officer. The trial court found neither actual bias, nor an intentional withholding of the facts by said juror, and

---

[2] Again, we remind the government that:

> The commission or attempted commission of a crime of violence is not an element of the crime of unauthorized possession of a firearm defined in V.I. CODE ANN. tit. 14, § 2253(a). Possession of a firearm during the commission or attempted commission of a crime of violence merely serves to enhance the penalty for unauthorized possession of a firearm. *Rabess v. Government of the Virgin Islands*, 30 V.I. 348, 355-57, 868 F. Supp. 777 (D.V.I. App. Div. 1994). *See U.S. v. Bruney*, 30 V.I. 360, 367-68 nn.18 & 20, 866 F. Supp. 874 (D.V.I. 1994) (The clause "during the commission or attempted commission of a crime of violence" is not an element of the crime of unauthorized possession of a firearm defined in 14 V.I.C. § 2253(a).); *U. S. v. Sebastien*, Crim. No. 1992-111, V.I. BBS 92CR111.DT1 at 7 (D.V.I. Mar. 25, 1994) ("[S]ection 2253(a) prescribes a single offense of unauthorized possession of a firearm of which there are [only] two elements: one, that the defendant possessed a firearm and two, that the defendant [possessed] it without authorization of law."); *see also U.S. v. Xavier*, 2 F.3d 1281, 1291 (3d Cir. 1993) (Section 2253(a) "provides punishment for unauthorized possession 'except that' a greater punishment applies for a defendant convicted of possessing a weapon during a crime of violence.").

*Government of the Virgin Islands v. Rodney Greenidge*, 1998 U.S. Dist. LEXIS 22373, Crim. No. 1996-045 (D.V.I. App. Div. June 30, 1998).

[3] The rules governing the practice and procedure of cases in the local courts of the Virgin Islands shall be governed by local law or the rules promulgated by those courts. Revised Organic Act § 21(c), 48 U.S.C. § 1611(c). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1994), *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 1998) (preceding V.I. CODE ANN. tit. 1).

denied the motion for a new trial. Sampson includes review of that denial in this appeal.

## DISCUSSION

### A. Jurisdiction and Standard of Review

This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all criminal cases in which the defendant has been convicted, other than a plea of guilty. 4 V.I.C. § 33; Section 23A of the Revised Organic Act of 1954. A review of the sufficiency of the record to support the convictions is plenary. *Walters v. Government of the Virgin Islands*, 36 V.I. 101, 103, 172 F.R.D. 165 (D.V.I. App. Div. 1997); *Charleswell v. Government of the Virgin Islands*, 167 F.R.D. 674, 678 (D.V.I. App. Div. 1996).

The judge's decision to admit the expert testimony of a forensic pathologist to give an opinion on the reasonableness of the medical care given to the victim is reviewed for abuse of discretion. *See Charleswell*, 167 F.R.D. at 678. Trial judges are afforded "wide latitude" in limiting cross-examination, subject only to a review for abuse of discretion. *Accord Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir. 1995).

The denial of a motion for a new trial is reviewed for abuse of discretion. *Colbourne v. Government of the Virgin Islands*, Crim. No. 95-214, 1995 U.S. Dist. LEXIS 21392 at n.3 (D.V.I. App. Div. Jan. 10, 1995); *Maduro v. P. & M. Nat'l, Inc.*, 31 V.I. 121, 125 (D.V.I. App. Div. 1994).

### B. Sufficiency of the Evidence

This Court's review of whether the evidence is sufficient to sustain appellant's conviction of murder in the first degree is plenary. Where the sufficiency of the evidence is challenged, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). In making this determination, this Court must view the evidence, and all reasonable inferences which may be drawn therefrom, in the light most favorable to the government. *DuBois v.*

*Government of the Virgin Islands*, 25 V.I. 316, 319 (D.V.I. App. Div. 1990).

Murder is the unlawful killing of a human being with malice aforethought. 14 V.I.C. § 921. First degree murder

(1) is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and premeditated killing; or

(2) is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem — is murder in the first degree.

(b) All other kinds of murder are murder in the second degree.

14 V.I.C. § 922. Malice aforethought

does not mean simply hatred or particular ill will, but extends to and embraces generally the state of mind with which one commits a wrongful act. It may be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences. And "where the killing is proved to have been accomplished with a deadly weapon, malice can be inferred from that fact alone."

*Government of the Virgin Islands v. Knight*, 26 V.I. 280, 764 F. Supp. 1042, 1049 (D.V.I. 1991) (citations omitted). Section 922 retains the common law distinction between second degree murder, which requires a killing with malice aforethought, and first degree murder, which in addition to malice aforethought requires a killing with premeditation and deliberation.

Appellant was found guilty of murder in the first degree pursuant to 14 V.I.C. § 922(a)(1), which "is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and premeditated killing." At trial appellant testified that, after seeing the lights go out, he walked back to his house and overheard his wife talking to someone on the telephone in a loving manner. He stood there listening for approximately twenty-five minutes, and since he had left his keys in the truck down the road, he asked her to open the door. Appellant entered the house, and

253

despite contrasting accounts offered by both sides, it is undisputed that the victim sustained a wound in the abdomen, as well as multiple abrasions and tiny lacerations, mostly to the front of her body, but also to other areas. (App. at 21.) Appellant contends that the government failed to prove that he "designed a plan to kill" his wife. (Brief of Appellant at 11.)

■ While premeditation involves a prior design to commit murder, no particular period of time is necessary for such premeditation. *Accord Government of the Virgin Islands v. Charles*, 33 V.I. 361, 72 F.3d 401, 410 (3d Cir. 1995); *Government of the Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1182 (D.V.I. 1989) (quoting *Government of the Virgin Islands v. Lake*, 362 F.2d 770, 776 (3d Cir. 1966) ("A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation. It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill.")). There must be some appreciable time for reflection and consideration before execution of the act, although the period of time "does not require the lapse of days or hours or even of minutes." *United States v. Frady*, 456 U.S. 152, 173, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982). As a practical matter, premeditation can generally be proved only by circumstantial evidence. *See Charles*, 72 F.3d at 410 ("If premeditation is found it must ordinarily be inferred from the objective facts.")

Appellant contends that once he entered the house, he and his wife sat down "exchanging ideas" and talking for a while about various acts of infidelity, but she eventually became enraged and "started cursing and carrying on" after learning of his affair with a Puerto Rican woman. (App. at 103-104.) She came charging after him with a knife, and he ran about the house trying to escape. Two neighbors testified, however, that during the fracas they heard Mrs. Sampson's repeated screams of "murder, murder. Please help. Call the police. Call the police," and "Henry, stop. You gon kill me. Henry stop." (*Id.* at 1, 15.) A reasonable jury could conclude from these accounts that Mrs. Sampson was not the sole aggressor, as

appellant contends. Furthermore, another neighbor testified that appellant told her that after listening to his wife on the phone, he went inside the house and "put some pick axe and he stab her up." (*Id.* at 19.) This testimony contradicts appellant's story that Mrs. Sampson ran into the knife as he was trying to fend her off.

After appellant and his wife had "rumble[d] in the yard a little," Mrs. Sampson had sustained injuries from a knife, a pick axe and a blunt object that could have been a hammer. (*See id.* at 118-21.) Despite these injuries, appellant says he left his wife sitting on the porch. Appellant left without trying to get help for his wife, because he feared his wife's "crazy" brother would kill him regardless of whether the police were there or not. (*Id.* at 122.) When their neighbor arrived, however, he did not find Mrs. Sampson sitting on the porch. Instead, he found her lying on the grass, partially clothed, saying "[c]ome help me here. I dying." (*Id.* at 10.)

Appellant further contends that in addition to the government's failure to prove premeditation, his testimony about hearing his wife on the telephone with another man was sufficient to show that the fight "was the product of a heat of passion." (Brief of Appellant at 10.) This argument is unpersuasive in light of appellant's account of the story. By his own testimony, appellant endured at least twenty-five minutes of listening to his wife in a loving conversation with another man, but calmly asked her to open the door. That he eventually gained access to the house through a window at the rear also suggests that Mrs. Sampson did not open the door because the situation was anything but calm.

An act in the "heat of passion" is one committed by a defendant under a "sudden and intense passion, resulting from serious provocation by another." *See, e.g., Gilmore, v. Taylor*, 508 U.S. 333, 337, 124 L. Ed. 2d 306, 113 S. Ct. 2112 (1993). It also means that at the time of the act the reason is disturbed or obscured by passion to an extent which might make ordinary men of fair, average disposition liable to act irrationally without due deliberation or reflection, and from passion rather than judgment. *Mullaney v. Wilbur*, 421 U.S. 684, 687 n.5, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975).

■ The evidence was clearly sufficient to support a conviction of first degree murder, and Sampson's defense of lack of premedita-

tion or malice aforethought was presented to the jury through the court's instruction that voluntary manslaughter is a lesser included offense of murder. (App. at 4.) Voluntary manslaughter is "the unlawful killing of a human being without malice aforethought . . . upon a sudden quarrel or heat of passion." 14 V.I.C. § 924(2).

## C. Expert Testimony

Appellant contends that a forensic pathologist, who has never performed an operation on a living person, should not have been allowed to give an opinion on the reasonableness of the medical care given to Mrs. Sampson. The government called two forensic pathologists to testify, Dr. Francisco Landron ["Dr. Landron"] and Dr. James Glenn ["Dr. Glenn"], but appellant specifically appeals the testimony of Dr. Landron.[4] Appellant contends that the court erred in allowing Dr. Landron to give an opinion on the standard of care given to Mrs. Sampson, and then in denying defense counsel's attempt to "demonstrate to the jury that [he] had no personal or technical knowledge relating to surgery." (Brief of Appellant at 18.) Despite this assertion, the record reveals that defense counsel cross-examined Dr. Landron about his knowledge and experience in surgery:

BY MR. JOSEPH:

Q And when last you perform an operation in the O.R.?
A Excuse me?
Q When was your last time you perform an operation in the operating room?
A I am not a surgeon. I do not perform operations.
Q In fact, you have never performed an operation —
A That's correct.
Q Never, isn't that correct?
A That is correct.

---

[4]Dr. Glenn testified generally that a deep stab wound had penetrated Mrs. Sampson's abdominal cavity, lacerated the left lobe of her liver, and penetrated or perforated her stomach, "allowing the contents of the stomach to spill out into the abdominal cavity." (App. at 43.) The inflamation of the abdominal cavity caused sepsis, "an overwhelming infection of the body," and led to her demise. (*Id.* at 44.)

(App. at 87.) The result of these errors, Sampson contends, was that the jurors were erroneously led to believe that the victim received proper surgical care at the hospital, which took their focus from the cause of death, peritonitis,[5] due to the treating physician's failure to properly diagnose the injury and treat the wound. As a result, appellant contends that he was prejudiced.

Trial judges have broad discretion with respect to the admission of expert testimony, and the Court of Appeals has held more than once that the "trial court's determination whether to admit or exclude expert testimony will be upheld 'unless manifestly erroneous.'" *Waldorf v. Shuta*, 142 F.3d 601, 627 (3d Cir. 1998) (quoting *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)). Here, the government established Dr. Landron's qualifications as a medical doctor specializing in the field of forensic pathology, a subspecialty of anatomic pathology. Anatomic pathology is defined as the study of "how your body reacts to disease by looking at the tissues or the body as a whole, as in an autopsy." (App. at 75.) With no objection from the defense, he was accepted by the court as a doctor specializing in that field. (Id. at 76.) Dr. Landron further explained that as a medical examiner his role is to determine the cause and manner of death.[6]

The trial court's action must be assessed against the liberal policy of admissibility embodied in Rule 702, which the Court of Appeals for the Third Circuit has ruled

> extends to the substantive as well as the formal qualification of experts. We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications. *See Hammond v. International Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982) (holding that an engineer, whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in a products liabil-

---

[5] Dr. Raymond Ippolito defined peritonitis as "inflamation in the belly cavity." (Appendix to Brief of Appellant at 70.)

[6] Cause of death "is a disease or an injury that results in a physiological derangement in the body that in turn leads to the person dying;" and manner of death "tells you how the death came about." (App. at 77.)

257

ity action involving tractors); *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87-88 (3d Cir. 1979) (holding that an expert could testify that unguarded elevator buttons constituted a design defect despite expert's lack of specific background in design and manufacture of elevators).

*In re Paoli Railroad Yard PCB Litigation ("Paoli II"),* 35 F.3d 717, 741 (3d Cir. 1994). Of course, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Aloe Coal Co.,* 816 F.2d at 114, *quoted in Waldorf,* 142 F.3d at 625. The *Waldorf* Court ruled that the trial court did not abuse discretion in allowing one who had no formal academic training in the area to testify as expert vocational rehabilitation witness based only on his experience through employment in attempting to provide jobs for disabled individuals and some familiarity with the relevant literature in the field. *Id.* at 627. The Court noted that "he has substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals." *Id.*

After Dr. Landron had testified in his specialty of forensic pathology, the defense objected when the government posed the following question: "With regard to the medical care rendered to Mrs. Sampson at the hospital, after reviewing those records, did you come to any opinion as to the care that was rendered?" (App. at 78-79.) When defense counsel objected, the following colloquy took place at sidebar:

> MR. JOSEPH: Judge, this doctor is unqualified. He is not a surgeon. He [is] simply not qualified to render an opinion as to care given in an area outside his specialty, which is pathology, the determination of cause of death, the performance of autopsies.
>
> Here we had a surgical patient and surgical procedures employed. So, he is testifying outside of his expertise. He was offered as — in the subspecialty of medicine of pathology.
>
> MR. JENNINGS: Please the Court, first of all, your Honor, counsel's objection is something that he could address on cross-examination.

THE COURT: It goes to the weight —

MR. JENNINGS: Correct.

THE COURT: — of the evidence, not the subject.

MR. JENNINGS: Correct.

MR. JOSEPH: Judge, I just wanted to point out that; that he does not possess the requisite specialized knowledge within the field . . . of medicine called surgery to render a reliable opinion to the jury. That is my objection; that under 702, there has been absolutely no testimony as to his qualification as a surgeon, and he is being now asked for an expert opinion.

. . . .

MR JENNINGS: Please the Court, [J]udge, first of all, this is not a regular witness. This is an expert witness, No. 1. Number 2, Dr. Ippolito sat on the stand and — he is a surgeon. He sat on the stand and he gave his opinion as to the cause of death, which is something that's determined by a forensic pathologist, and that was allowed. If counsel wants to challenge this witness' qualifications or expertise, he could do that on cross-examination.

. . . .

MR. JOSEPH: Judge, let me just, please, if I may this one last thing. Doctor Ippolito's opinion was whether there was gross negligence in the treatment. He took the cause of death from the autopsy report. . . . So, Dr. Ippolito didn't make an independent conclusion as to cause of death. . . . .

THE COURT: I understand, I think the objection, Attorney Joseph, goes to the weight which the jury can give to the evidence and not to its admissibility. So, I'm going to allow the question.

MR. JOSEPH: Then, just for the records, is the Court then allowing the doctor to testify as an expert in the field of surgery?

THE COURT: No, the Court is not. The Court has said this is an expert in the area of forensic pathology. The Court has said this question is . . . permissible; and the answer that he can give to the question is admissible. And your objection goes more to the weight of the evidence. Goes to the weight of the evidence. That's the Court's ruling.

(App. at 79-83.) Dr. Landron offered the following opinion regarding the standard of care given to Mrs. Sampson:

Yes. I think that upon admission, Mrs. Sampson was stable. Her vital signs were stable. Aside from the pain, she was in no sign of shock. There was no obvious source of bleeding internally, and there was a negative chest x-ray and a negative abdominal x-ray.

I think in surgery, there is an area of controversy within the field of surgery as to how to treat a patient with a stab wound to the abdomen. If there are no — obviously, if there is signs of hemorrhage, every surgeon will go in and do an exploratory laparotomy.

There was no clear cut evidence for him to — to perform an exploratory laparotomy initially because remember, surgical procedures in and of themselves with the anesthesia also have a risk of morbidity and mortality. And the surgeon also wants to avoid doing unnecessary exploratory surgery.

So initially, I think I would not categorize it as grossly negligent. I would say it was an honest error in judgment; and that it was unfortunate that Mrs. Sampson had no symptoms until later on in the course of her disease; was unfortunate that there was no positive signs on the abdominal x-ray; it was unfortunate that there was no blood in the stomach.

So that initially, I would not say it was grossly negligent. I would say it was a viable option to observe; that was the choice the surgeon opted for. Unfortunately, it turned out to be an error in judgment, but it was not grossly negligent.

Q   Again, is it fair to say that the doctor in this case followed that school that prescribed to the expectant management as opposed to just going right away and start exploring around?
A   That is correct.

(App. at 84-85.)

■ We agree with the parties and the trial judge that the competency of expert witnesses to testify is governed by the Federal Rules of Evidence,[7] and not the Uniform Rules of Evidence, as adopted by the Virgin Islands Legislature.[8] Since the defense did not object to the qualifications of Dr. Landron to testify as an expert medical witness specializing in forensic pathology, there can be no doubt about his basic expertise and capacity to testify as a medical expert. Once a doctor is qualified to testify as an expert medical specialist in one area, proof of his qualifications in another specialty is not required before he can testify in that other specialty. It would be "an abuse of discretion to exclude testimony simply . . . because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) (Trial court cannot restrict medical expert's testimony "based on a requirement that the witness practice a particular specialty to

---

[7] The rules governing the Territorial Court of the Virgin Islands are specific on this point:

> In all trials in the Territorial Court the testimony of witnesses shall be given orally, unless otherwise provided by these rules or the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence. *The admission of evidence and the competency and privileges of witnesses and parties shall likewise be governed by* these rules, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.

TERR. CT. R. 12 (emphasis added).

[8] As enabled by § 21(c) of the Revised Organic Act of 1954, 48 U.S.C. § 1611(c), the Legislature of the Virgin Islands included a comprehensive set of rules of evidence when it enacted the Virgin Islands Code in 1957 by adopting, almost verbatim, the Uniform Rules of Evidence. See 5 V.I.C. §§ 711-956 (Michie 1997). Because Rule 26 of the Federal Rules of Criminal Procedure governed the admissibility of evidence and was made applicable to the Virgin Islands by FED. R. CRIM. P. 54, "the Uniform Rules of Evidence contained in this chapter do not apply in criminal actions." Editor's Note preceding 5 V.I.C. § 771, at 261. *See Government of the Virgin Islands v. Dyches*, 507 F.2d 106, 108 & n.2 (3d Cir. 1975); *see also Government of the Virgin Islands v. Pondt*, 456 F.2d 679, 681 (3d Cir. 1972).

testify concerning certain matters" and court erred in finding that the doctor was not qualified to render a diagnosis or to discuss the pathology report because he was not a pathologist, oncologist or expert in "definitive cancer diagnosis.").

Whatever doubts there may be about Dr. Landron's qualifications, we emphasize that "[o]nce the trial court has determined that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded the expert testimony rather than to its admissibility." *Waldorf* at 627 (citation omitted).[9] Moreover, if the liberal standard of Rule 702 allows an engineer who teaches auto mechanics to testify in a products liability action about tractors, *see Hammond*, 691 F.2d 646, and an individual who only has on the job training in placing disabled persons to testify as an expert in vocational rehabilitate, *see Waldorf*, 142 F.3d 601, it surely allows a medical doctor trained in forensic pathology to give his opinion on whether the actions of a surgeon were so grossly negligent that caused the death of the victim.

■ We hold that the trial court did not err in allowing Dr. Landron to give his opinion on the reasonableness of the care given at the hospital, once he was admitted as an expert in forensic pathology.

## D. Limits on Cross-Examination

■ Appellant avers that the trial judge erred in disallowing cross-examination of Dr. Landron on the issue of bias. The standard of review is abuse of discretion. In judging if there was an

---

[9] *See, e.g., Barefoot v. Estelle*, 463 U.S. 880, 902, 77 L. Ed. 2d 1090, 103 S. Ct. 3383 (1983) (holding that differences in expert opinion go to weight of evidence and not to admissibility of such testimony, and it is the jury's province to resolve such disputes); *Holbrook*, 80 F.3d at 782 ("Because of our liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility."); *Habecker v. Copperloy Corp.*, 893 F.2d 49, 52 (3d Cir. 1990) (holding that the proposed expert should have been allowed to testify because his inexperience in the areas of design and manufacturing should go to the weight, not the admissibility, of his opinion); *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) (holding that "[w]here there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge"); *Heinze v. Heckler*, 581 F. Supp. 13 at 14 (holding that a medical witness' opinion in an area of medicine in which he/she does not practice goes to the weight, not the admissibility of such testimony).

abuse of discretion, the Confrontation Clause generally guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 106 S. Ct. 292 (1985). In determining whether the limits on cross-examination in this case were reasonable, the Court must ask whether a "reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Olden v. Kentucky*, 488 U.S. 227, 232, 102 L. Ed. 2d 513, 109 S. Ct. 480 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986)); *see Douglas*, 50 F.3d at 1230 ("Trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant.") (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1370-71 (11th Cir. 1994)).

After the government had elicited Dr. Landron's opinion on the reasonableness of the surgical care given to the victim, the following discourse took place on appellant's rebuttal cross-examination:

BY MR. JOSEPH:

Q    Doctor, did I understand you to say that you work for the Government of the Virgin Islands?

A    That is correct.

Q    As a medical doctor, are you aware of what is called malpractice?

MR. JENNINGS: Objection.

. . . .

MR. JOSEPH: My probing goes to bias, your Honor. He is an employee; he is the chief pathologist of one of the —

THE COURT: I'm not sure what the nature of the objection is.

MR. JENNINGS: The nature of the objection, your Honor, is that this case is not about malpractice. And I think counsel is introducing improper information into this case and is attempting to influence the jury improperly.

THE COURT: You wish to respond?

MR. JOSEPH: Sure, Judge. Bias. I believe it's a proper question to show bias on the part of this employee of the Government of the Virgin Islands that if he admits that it was negligence, he is exposing his employer to a lawsuit in malpractice, possibly not necessarily, but possibly; so that he has an ulterior motive to keep that information from the jury.

THE COURT: I think it's allowable as long as you don't speak about any specific malpractice case.

MR. JOSEPH: Judge, I'm just gonna ask him isn't it true that when — that if he admits that the conduct was negligent that he is exposing the Government to a malpractice suit.

MR. JENNINGS: That is very improper, Judge. That is extremely improper. First of all, there is no foundation for it. And secondly, there has been no demonstration of any bias. I mean, he has not asked the witness any question to demonstrate any bias. He is making this leap of faith. And it is our view for the sole purpose —

THE COURT: Well, I'm not going to allow it as I think about it. You may ask him where he works, and you may ask him all the other allowable questions, and then you may argue to the jury.

(App. at 88-90.)

■ In this case, the jury had already heard that Dr. Landron was a medical examiner employed as the Chief of Pathology at the Roy L. Schneider Hospital in St. Thomas. From that testimony, the trial judge concluded that the jury had sufficient information to make a

discriminating appraisal of the witness's motives and bias, and we cannot find this to be an abuse of discretion. While not stated explicitly, it appears, and we find, that the judge excluded defense counsel's questioning about admission of negligence and malpractice to avoid admitting marginally relevant and possibly confusing evidence which might mislead or confuse the jury. The trial judge also made it clear to counsel that he could argue the import of the relevant evidence which was before the jury. The defense presented evidence of Dr. Landron's position and place of employment, from which to argue to the jury that his motives were questionable and that the jury should find that his testimony was biased. We accordingly conclude that the trial judge did not abuse her discretion or err in precluding defense cross-examination of Dr. Landron on the issue of malpractice.

## E. Motion for New Trial

The issue is whether the trial judge erred in denying appellant's motion for a new trial based on the newly discovered evidence that juror no. 7 failed to disclose that he was a peace officer. Sampson argues that his Sixth Amendment[10] right to a trial by a fair and impartial jury was thereby prejudiced.

■ Before a defendant in the Territorial Court can be granted a new trial on the ground of newly discovered evidence under Rule 135 of the Rules of the Territorial Court, the trial judge must find that the defendant has satisfied a five-part test:

(1) the motion must allege facts from which the court may infer diligence on the part of the movant;
(2) the evidence must indeed be newly discovered, meaning discovered since the trial;
(3) the evidence must not be merely cumulative or impeaching;
(4) the evidence must be material to the issues involved; and

---

[10] The Sixth Amendment to the U.S. Constitution is made applicable to the Territory of the Virgin Islands through § 3 of the Revised Organic Act. 48 U.S.C. 1561.

265

(5) the evidence must be of such probative value, and of such nature, that it would probably produce an acquittal if presented at a new trial.

*Accord, e.g., United States v. DiSalvo*, 34 F.3d 1204, 1215 (3d Cir. 1994); *Government of the Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985). For the reasons stated below, we hold that the trial judge did not abuse her discretion in denying Sampson's motion for new trial.

Appellant's motion stated that his counsel learned by happenstance several weeks after trial that one of the jurors in his case was the supervising enforcement officer for the Virgin Islands Department of Finance. We agree that the failure of a juror to disclose information during voir dire may qualify as newly discovered evidence under Rule 135. While appellant may have established that the evidence was newly discovered, and thus met the second prong of the five-part test, he has failed to establish the first requirement. Sampson did not allege facts from which the trial judge could infer that this information would not have been discovered at an earlier time if he had been diligent.

As the trial court noted, the juror's questionnaire was always available to the defense, as demonstrated by the ease with which a copy of it was obtained after counsel saw the juror dressed in a law enforcement uniform. (March 10th Op. at 6-7.) The juror's employment, job title, and statement that he was responsible for "enforcing collection of Government delinquent accounts" was disclosed in the juror qualification questionnaire available before and during voir dire. (*Id.* at 3.) Since all five prongs of the test must be met before a new trial may be granted based newly discovered evidence, we need not examine the remaining elements.

As if this were not enough, a party seeking a new trial based on a juror's failure to disclose information during voir dire must also

> first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

266

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 78 L. Ed. 2d 663, 104 S. Ct. 845 (1984). Appellant again fails to meet the first requirement that the juror in his case failed to answer a voir dire question, for the record shows that the venire panel was never asked whether any of them were currently employed by any law enforcement agency or by the government.

■ Only the following two questions were asked regarding employment:

> Is there anyone on the panel who has a *family member or a friend* who is currently employed or was previously employed by the department of Justice of the Virgin Islands or any other department concerned — of the Government of the Virgin Islands concerned with criminal prosecution and law enforcement?

> Is there anyone on the panel who is currently employed by *any law enforcement agency of the federal government*, that is, the office — for example, such as the office of the United States Attorney, the post office department, the U.S. Customs and that would be — let me narrow that question — employed by any department that is concerned with criminal prosecution or law enforcement?

(March 10th Op. at 5-6) (emphasis added). In denying appellant's motion for a new trial, the trial court found that "the questions, as posed, did not require the juror to disclose the fact that he is a peace officer." (*Id.*) We agree that the juror did not fail to answer a material question on voir dire. Once this was established, there was no need examine whether the answer, had he given one, would have provided a valid basis for a challenge for cause.

### CONCLUSION

For the reasons stated in this opinion, we affirm the rulings of the Territorial Court.

DATED this 5 day of April 2000.