**JAMIL NEWTON, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

D.C. Crim. App. No. 2001/67

District Court of the Virgin Islands

Division of St. Thomas and St. John

Division of St. Croix

September 19, 2005

STEPHEN BRUSCH, ESQ., The Brusch Law Firm, St. Thomas, U.S.V.I., *Attorney for Appellant.*

DOUGLAS JUERGENS, AAG, St. Thomas, U.S.V.I., *Attorney for Appellee.*

FINCH, *Chief Judge, District Court of the Virgin Islands*; GOMEZ, *Judge of the District Court of the Virgin Islands*; and HODGE, *Judge of the Superior Court, Sitting by Designation.*

## MEMORANDUM OPINION

(September 19, 2005)

Jamil Newton ["Newton", "appellant"] appeals his conviction by jury in the Superior Court for murder in the second degree. The issues presented for review, as framed by the appellant, are as follows:[1]

1) Whether the prosecution failed to prove that the victim's cerebral trauma and subsequent death resulted from his being struck by the appellant's vehicle;

2) Whether the prosecutor made repeated material misstatements of fact, thereby prejudicing the defendant's right to a fair trial;[2]

3) Whether the trial court relied on facts not in evidence in deciding the Rule 29 motion;[3]

---

[1] These issues are as stated in both the appellant's brief and supplemental brief.

[2] Given our determination below regarding the sufficiency of evidence of causation, we find no merit in Newton's assertions that the prosecutor's opening statement promising to prove that Newton caused Gray's death was prejudicial and inflammatory because of a subsequent failure of proof on that issue. Newton's additional challenges regarding the prosecutor's closing statements that Gray was taken from the scene by ambulance and that Newton was speeding also warrant little consideration in light of the evidence reflected in the record. [J.A. at 25, 30, 104, 109-10; Appellant's Supplemental Br. at SA 11].

4) Whether the trial court erred as a matter of law in denying appellant's Rule 29 motion;[4]

5) Whether the evidence presented at trial was insufficient to establish malice aforethought and specific intent to murder;

6) Whether the trial court erred in refusing to consider appellant's objections to the presentence report and in denying appellant's request to supplement the information it contained prior to sentencing; and

7) Whether it was error to admit a verbal statement by appellant's minor sister, Cleo Taylor, regarding appellant's prior attempt to "run down" the victim with his car, where Taylor did not adopt the statement as her own.

For the reasons more fully stated below, we will affirm the trial court's denial of Appellant's motion for judgment of acquittal.

## I. STATEMENT OF FACTS

On January 25, 2000, Ian Gray ("Gray") was struck by a vehicle driven by Jamil Newton ("Newton" or "appellant") as he ran through the Estate Strawberry community ("Strawberry") on St. Croix. Gray died a day later from severe head injuries.[5] From all accounts, the collision and Gray's death was a culmination of an altercation that started at the Baron's Spot Mall ("the mall") just minutes earlier, although Newton disputes that the collision was intentional. On that day, Gray was sitting on a wall at the mall immediately across from the Strawberry community, along with at least five other friends. [Joint Appendix ("J.A.") at 21, 45-46, 135-37]. It is undisputed that Newton initially drove away from the mall that afternoon with his minor sister, but immediately returned after one of the men yelled out something about Newton's then 13-year old sister, Cleo Taylor ("Taylor"). [J.A. at 21, 46,

---

[3] . We need not reach this issue, as it would have no bearing on this court's *de novo* review of the Rule 29 issues.

[4] The appropriateness of the trial court's denial of the Rule 29 motion will necessarily be discussed in the context of the particular challenges raised in that motion.

[5] There was some testimony that Gray may have actually been brain dead from the same day of the collision. His mother, Rose Olive Appleton, testified that upon his arrival at a Puerto Rico hospital, the doctor's notified her that it was already too late, presumably to save her son's life. [J.A. at 17].

193].[6] After returning and confronting the men, Newton was struck several times by Gray, who was undisputably the initial aggressor. [*Id.* at 141, 54-55]. It is at this point that the witnesses' version of the facts significantly diverge from that of Newton.

Two of the other men accompanying Gray that day—Ossie Constant ("Constant") and Eufield John-Baptist ("John-Baptist")—testified that after Gray struck Newton several times with his hands, Newton got into his car and drove his car toward Gray, striking him with the car's door. [J.A. at 22, 46-48, 58]. According to Constant:

> "He drive off and he made a U-turn, and while he made the U-turn everyone thought he was leaving, but he made a U-turn and came in after Ian (Gray) and Ian was backing up toward the rocks and we were all watching and his sister been there, but on the other side of the car. Cleo was watching and he drive come straight to the rocks and when we see that we start running. We run till about the mall, and I see the car coming and smash into the rocks." [sic]

[J.A. at 22]. John-Baptiste testified similarly that:

> "[A]fter (Taylor) jumped out of the vehicle this man kick his car in reverse and end up hitting Fari (Gray) with the door ... after he hit Fari with the door he jumped out of the way and when Fari jumped out the way, he spin his car around."

[J.A. at 46-47]. Both Constant and John-Baptiste also testified that as a result of Newton's first attempt to strike Gray, who was standing behind a rock, Newton's car momentarily got stuck on the rocks, and the men took that opportunity to flee the area.

[*Id.* at 22, 46-47].

Taylor, who also witnessed the mall incident and who testified for the defense, acknowledged she talked to police on the day of the incident but denied on cross-examination telling police that Newton had attempted to strike Gray with his car during that initial confrontation. [Supplemental Br. of Appellant at SA 12-17]. However, Police Detective Stephen Brown("Detective Brown") was called on rebuttal to impeach Taylor's

---

[6] [But *see* J.A. at 136-37] (Newton's version is that he returned because he forgot his keys at a restaurant he was about to open there; the other witnesses, including Taylor, testified he turned back after one of the men yelled something about his sister).

testimony with a contrary oral statement made to police on the day of the incident. [J.A. at 206].

Newton also refuted assertions he tried to strike Gray with his car at the mall prior to hitting the rocks. Rather, he asserted that he accidentally missed the reverse gear and lurched forward as he struggled to escape Gray's assault, landing onto the rocks. [J.A. at 153, 169-f-169-g, 170]. All of the witnesses, including Newton, agreed that when Newton got stuck on the rocks for a brief time, Gray and his friends fled into the nearby Estate Strawberry community. Several of the men rode bicycles; Gray fled on foot. [*Id.* at 48, 153-55].

Constant and John-Baptiste both offered testimony that Newton pursued them in his vehicle into Strawberry. Constant testified they had passed Gray and stopped at a yard to take cover. Shortly after, Constant looked up, "because I know it was a speeding car after one of us and I don't know how fast the car was going and I don't know if it was coming at me so I stop to look back to see if the car was still coming ... ." [sic] [*Id.* at 30]. It was then that he saw "(the car) just went straight and hit Ian (Gray)." [*Id.* at 30-32]. Alton Lindsay ("Lindsay"), whose home was near the sight of impact, was in his yard watering his plants and witnessed the collision. Lindsay painted a picture of several young men running for their lives just moments before the collision.

> Suddenly I heard a noise coming from Queen Mary (Highway) into Strawberry. ... Afterward, I saw two guys on a bicycle coming, riding in fast and a third one said, let's go, let's go. So when they reach the corner, three of them heading south and minutes after I saw the other guy running on foot in the same direction and when he reach them a white car behind of him, and when he reach by that corner, the car struck him and the car was heading across the road to my fence and I was about to drop the hose and run and then afterward the car stop sudden and reversed back and the guy dropped off the car on his back. [sic].

[J.A. at 66-67; *see also, id.* at 75].

Gray was struck from behind and landed on the hood of Newton's car; the windshield of the car was also cracked in the collision. Gray was then thrown from the car onto the pavement when Newton reversed to leave the area. [J.A. at 70]. The witnesses testified—and Newton conceded— that he simply turned around and left the area following the incident.

Newton also conceded he then went home and did not call for medical help nor the police, despite admitting he had a cellular phone with him; he went to police only after investigators contacted him later that evening. [*See e.g.,* J.A. at 70, 161, 178].

At trial, Newton did not dispute evidence he pursued Gray, but he claimed he did so because Gray had ripped a gold chain from his neck during the altercation, and because of the need to know where Gray lived to aid in later recovering that chain. [J.A. at 155-56]. Newton also admitted to having struck Gray with his vehicle in Strawberry but argued at trial it was accidental, as he turned into the same area as Gray was running across the street and did not see Gray until the collision had occurred. [*Id.* at 153-55, 165, 171-73].

Gray was taken to the Juan F. Luis Hospital on St. Croix and subsequently transported to a Puerto Rico Hospital, where he was declared dead a short time later. [J.A. at 17-19]. Forensic specialist, Dr. Yocasta Brugal testified that an autopsy performed on January 27—two days after the collision—showed Gray died as a result of severe cranial cerebrum trauma. [*Id.* at 84-85]. He testified that Gray was found to have "severe cranium cerebral trauma; fracture of the cranium. ... trauma in the cerebrum like bleeding and edema" and eruptions or scrapes in different parts of the body." [J.A. at 84-85].

Newton was charged with first degree murder. The court instructed the jury of the lesser included offenses of murder in the second degree, voluntary and involuntary manslaughter, as well as excusable and justifiable homicide. The jury returned a verdict of guilty on the lesser charge of murder in the second degree, and Newton was subsequently sentenced to 20 years imprisonment. This appeal followed.

## II. JURISDICTION AND STANDARDS OF REVIEW

This Court has jurisdiction to review this timely criminal appeal. *See* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004), which repealed 4 V.I.C. §§ 33-40, and reinstating appellate jurisdiction formerly provided under 4 V.I.C. § 33).[7]

---

[7] *See* Revised Organic Act of 1954 § 23A, 48 U.S.C. § 1614, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 159-60 (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

We afford plenary review to the lower court's denial of a motion for judgment of acquittal, using the same standard the lower court should have employed in the first instance. *See Government of V.I., v. Sampson*, 94 F. Supp. 2d 639, 641 (D.V.I. App. Div. 2000); *Walters v. Government of V.I.*, 172 F.R.D. 165, 167, 36 V.I. 101, 103 (D.V.I. App. Div. 1997). Under that standard, this Court must determine whether the evidence of record, viewed in a light most favorable to the government, was sufficient to permit a reasonable jury to find the defendant guilty of the charged crime beyond a reasonable doubt. *See Sampson*, 94 F. Supp. 2d at 641-43. In reviewing the appellant's challenge to the sufficiency of the evidence, this Court will not assess the credibility of witnesses or re-weigh the evidence but, rather, is held to the jury's verdict absent a showing the prosecution failed to carry its burden to establish the essential elements of the crime at trial. *See Sampson*, 94 F. Supp. 2d at 643. It is the appellant's burden to show a complete failure of the prosecution to establish the essential elements of the claim. *See United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992).

## III. DISCUSSION

At the outset, we reject Newton's challenges to the sufficiency of the evidence to prove he caused Gray's death, where no medical expert testimony was adduced affirmatively linking Gray's injuries and subsequent death to Newton's conduct in striking him with his vehicle.[8]

---

[8] The causal connection between the appellant's conduct and the victim's death may be shown by either direct or circumstantial evidence, as the law makes no distinction between the two. *See e.g., Government of V.I. v. Bradshaw*, 569 F.2d 777, 779, 15 V.I. 481 (3d Cir. 1978). Thus, a finding of guilt for murder is sustainable so long as the jury had before it sufficient evidence from which it could reasonably infer a nexus between the defendant's actions and the victim's subsequent death. In that regard, expert medical testimony generally is not required in the normal case where there is no conflicting theory of causation and the nature of the death or injury is not so obscure that its source cannot be readily inferred from the facts of the case. *See Hall v. State*, 34 Ala. App. 246, 38 So. 2d 612, 613 (1949) (holding evidence sufficient to support finding that defendant caused the victim's death by stabbing him, despite the absence of expert testimony, where the 19-year old victim was physically fine prior to being stabbed and died after the stabbing); *Glover v. State*, 211 Ark. 1002, 204 S.W.2d 373, 374 (D. 1947) (holding causation sufficiently proved, despite absence of medical testimony, where victim was healthy prior to being struck in the head with a bottle and then subsequently lost consciousness and died 24 hours later, where no other cause of death suggested); *State v. Engstrom*, 79

We additionally reject the appellant's arguments surrounding the sufficiency of the evidence to establish the element of malice aforethought.[9] Accordingly, the only issues warranting discussion are those surrounding the appellant's objections to the presentence report and the

---

Wash. 2d 469, 487 P.2d 205, 210 (1971) (testimony by witness and policie officer regarding victim's observable injuries at the scene held sufficient to prove defendant caused victim's death, despite absence of medical testimony, where just prior to the time of impact the decedent was upright and walking on the side of the road); *Brundage v. State*, 70 Ga. App. 696, 29 S.E.2d 316, 317 (1944) (Evidence held sufficient where victim was fine prior to shooting and died several days after being shot and where there was no evidence that anything else other than the gunshot wound inflicted by the defendant caused the victim's death); *State v Brandt*, 467 S.W.2d 948 (Mo. 1971) (holding that the cause of death may be established in a prosecution for unlawful homicide without the use of expert medical testimony where the facts in evidence are such that every person of average intelligence would know from his own experience or knowledge that the wound was mortal in character); *State v Croka*, 693 S.W.2d 133 (Mo. App. 1985) (noting expert testimony from physician was not required to prove cause of death in second-degree murder case, and circumstantial evidence was sufficient, where facts in evidence were such that persons of average intelligence would know that wound was mortal in character); *But see White v Commonwealth*, 360 S.W.2d 198 (Ky. 1962) (circumstantial evidence was not sufficient to support a conviction of voluntary manslaughter, and expert testimony was required, where the victim later died after being struck by the defendant in the face several times with his fist, knocking him down and causing both eyes to be swollen shut, because in common knowledge and experience such blows to the face do not ordinarily cause death).

[9] Newton argues the government failed to establish the element of malice aforethought, where the evidence adduced at trial pointed to a purely accidental killing or heat of passion. (Br. of Appellant at 24-25). This argument is unconvincing in light of the record. To the contrary, the facts of the case provided compelling grounds for the jury to infer Newton intended to kill Gray when he struck him with his vehicle. *See e.g.*, *Sampson*, 94 F. Supp. 2d at 641; *Government of V.I. v. Commissiong*, 706 F. Supp. 1172, 1182 (D.V.I. 1989); *Government of V.I. v. Lake*, 362 F.2d 770, 774, 5 V.I. 594 (3d Cir. 1966) (all standing for proposition that intent is to be inferred from the surrounding facts, to include the circumstances of the act, the actions and words of the defendant, the obvious nature of the act as one which could have grave consequences, and the defendant's prior confrontations with the victim). Moreover, the court additionally instructed the jury on the lesser-included offenses of voluntary and involuntary manslaughter, which contemplates killings done in the heat of passion or sudden quarrel and without malice aforethought. [J.A. at 251-54]. The jury was additionally instructed on excusable and justifiable homicide. [*Id.* at 255-56]. The appellant's arguments that the evidence established an accidental killing and did not support a finding of malice aforethought were, therefore, considered and rejected by the jury.

admission of an oral statement by appellant's minor sister, as stated in Issues Nos. 6 and 7 above.

## A. Objections to Pre-sentence Report

Newton claims error in the trial court's failure to amend the presentence investigation report ("PSI") as requested and its failure to defer sentencing until additional facts surrounding Gray's medical records showing his condition at the time of his death could be obtained.

 A sentencing court enjoys broad discretion in the information and factors to be considered at sentencing, and its determinations in that regard are reviewed for abuse of discretion. *See Quetel v. Government of V.I.*, 178 F. Supp. 2d 482, 485 (D.V.I. App. Div. 2001); *United States v. Baylin*, 696 F.2d 1030 (3d Cir. 1982) (court may consider any information relevant to defendant's sentencing and which helps to shed light on the defendant's life, history and characteristics, to aid in setting a sentence suitable to the individual). Where the challenge surrounds the sentencing procedures, implicating due process concerns, we afford plenary review. *See Quetel*, 178 F. Supp. 2d at 485; *see also, United States v. Felder*, 706 F.2d 135, 137 (3d Cir. 1983). A trial court abuses its discretion and violates the defendant's right to due process where it relies on inaccurate information at sentencing. *See United States v. Tucker*, 404 U.S. 443, 446-47, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972); *Baylin*, 696 F.2d 1030.

To aid in its consideration of information relevant to determination of an appropriate sentence for each defendant, the rules of the Superior Court permit consideration of a PSI prepared by its probation office, and additionally mandate that the defense be given an opportunity to offer a statement on his behalf and information in mitigation of punishment. *See* SUPER. CT. R. 134(a).

Prior to sentencing, Newton filed a written objection to portions of the PSI. [*See* App. at 363]. At the sentencing hearing, Newton was permitted to offer arguments on those objections and argued that Gray's medical records were important to sentencing because: a) the affidavit supporting the Information showed that Gray was found to have cocaine in his system at the time of the incident, a fact Newton contends was relevant to the conduct of the deceased; and b) Gray's parents may have made a decision to remove him from life support. [*Id.* at 364]. Newton argued that Gray's medical records would have reflected these facts and were,

therefore, relevant to the court's understanding of causation. [*Id.* at 365-67]. The government countered that all medical records had been produced in pretrial discovery and, additionally, that Dr. Yocasta Brugal, the forensic specialist, had been made available for cross-examination by the defense. [*Id.* at 369-70]. The government additionally argued that any decision by Gray's parents to remove him from life support could not be regarded as an intervening cause of his death.[10] [*Id.*].

After hearing arguments on the objections to the PSI, the court, noting it was the duty of the defense and not the probation officer to produce information in mitigation of sentencing, denied Newton's objections and proceeded with sentencing. In so holding, the court found the proffered information irrelevant to the defendant's sentence and noted it was satisfied it had sufficient information before it to impose sentence. [*Id.* at 372]. After affording the defense an opportunity to address the court, sentencing was then imposed. [*Id.* at 372-75].[11]

 In permitting the defense to be heard at sentencing and to express objections and the reasons therefor, the court fully complied with the requirements of SUPER. CT. R. 134.[12] Moreover, we find no abuse of discretion in the court's refusal to consider the issues raised by the defense at sentencing. As the court noted, whether Gray was removed from life support went to the factual issue of causation, relevant to guilt, and was not necessarily relevant to sentencing following the jury's determination of guilt. [*Id.* at 368]. Therefore, in the absence of any

---

[10] Whether the appellant's removal from life support precluded his murder conviction is not raised on appeal, except to the extent the appellant contends it was relevant to sentencing. Therefore, we need not directly reach that issue.

[11] In imposing sentence, the court noted it had reviewed the medical records and autopsy report and found any facts regarding the family's decision to remove him from life support of no significance at sentencing, given the facts of the case and the fact that Gray was "knocked unconscious as a result of the collision with (Newton's) vehicle and remained unconsious when he was ordered transported to Puerto Rico" and, in fact, determined to be brain dead before he got to Puerto Rico. [J.A. at 374-75].

[12] While SUPER. CT. R. 134 addresses the PSI, it does not mandate a specific procedure for consideration of objections to the PSI. *See id.; compare* L.R.CR. 32.01(b)-(f), 32.02 (outlining procedure mandated for consideration of objections to PSI in the District Court). Therefore, in view of a contrary local rule, the procedures urged by the appellant based on federal and district court rules are inapplicable here. *See* SUPER. CT. R. 7 (noting the applicability of federal and other rules only to the extent not inconsistent with existing rules of that court).

assertion that the trial court considered irrelevant or inaccurate information in making its sentencing determination, we find no abuse of discretion.

## B. Admission of Evidence

At trial, Police Detective Stephen Brown offered rebuttal testimony regarding an oral statement to police by the appellant's teenage sister, Cleo Taylor, that Newton had attempted to "run down" the victim with his car after the two fought at the Barron's Spot Mall. Newton objected at trial to admission of Detective Brown's testimony, on grounds the statement of the then-13-year old, taken without the presence of a parent, was illegally obtained and should have been suppressed. Newton now also claims error in the court's admission of Detective Brown's testimony, where Taylor did not adopt that statement as her own.

Admission of evidence is within the discretion of the trial court and is reviewed for abuse of that discretion, although plenary review is afforded evidentiary challenges based on the court's interpretation of legal principles. *See United States v. Furst*, 886 F.2d 558, 571 (3d Cir. 1989); *Rivera v. Government of Virgin Islands*, 635 F. Supp. 795, 798 (D.V.I. App. Div. 1986). Where this Court determines the admission of trial evidence was improper, reversal is, nonetheless, unwarranted if such error was harmless. *See United States v. Mitchell*, 365 F.3d 215, 253 (3d Cir. 2004).

### 1. Legality of Taylor's Statement

Although, as we have previously recognized, a criminal defendant does not generally have the right to assert the constitutional rights of another person, given the personal nature of constitutional rights, we may nonetheless reverse a conviction "based on evidence that rendered the trial fundamentally unfair." *See Georges v. Government of Virgin Islands*, 119 F. Supp. 2d 514, 522 (D.V.I. App. Div. 2000) (citations omitted). Newton's arguments that police used improper procedures under Virgin Islands law in obtaining Taylor's statement present no basis for reversal.

■ The applicable statute extends procedural safeguards governing the use of statements to minors faced with adversary proceedings and are inapplicable to the facts of this case:

**No admissions or statements of a child made while in custody to law enforcement officers ... during the processing of the case shall be admissible in evidence against the child** unless the government proves to the court's satisfaction the following:

(a) That at all stages of the interrogation the child was informed of his constitutional rights against self-incrimination and understood them; and

(b) That no physical force or coercion, promises, threats, or other unlawful means of inducement were employed in obtaining the confession, admission or other incriminating statement; and

(c) That a parent or guardian who does not have an adverse position, a friendly adult, or the child's attorney was present at the interrogation when a statement is given.

5 V.I.C. § 2512 (emphasis added). The statute's plain language makes clear that the limitations on admissibility of statements by minors contemplate circumstances where the minor, rather than a third person, is subjected to the adversarial process and where the statements are made in a custodial setting.[13] The statute is in line with the widely-held view that minors are, in general, more susceptible to police coercion than adults in custodial interrogations, thus warranting additional procedural safeguards. *See e.g., Alvarado v. Hickman*, 316 F.3d 841, 843 (9th Cir. 2002) (citations omitted). The statute does not, however, similarly limit the use of statements by minors who are mere witnesses to a crime and whose statements are not self-incriminating.

The appellant has asserted no facts to suggest that Taylor was in custody at the time she made the statement or that she was then the subject of the police investigation. There are further no facts of record to suggest that Taylor's statement was the product of coercion or was otherwise involuntary, lending to a fundamentally unfair trial. Accordingly, we find no error.

---

[13] *See Licata v. United States Postal Services*, 33 F.3d 259, 261 (3d Cir. 1994); 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION §§ 46.01-46.02 (5th ed.) (where meaning of statute plain on its face and free of ambiguity, judicial inquiry is at an end and no inquiry into history required).

## 2. Admissibility of Taylor's Statement

We turn now to Newton's latter argument that Brown's rebuttal testimony was improperly admitted, where Taylor denied ever making the challenged statement and where that statement was offered as substantive evidence. The Government argues this was proper impeachment of Taylor, who took the stand and denied making the statement to which Brown testified.

■Under Virgin Islands law, prior inconsistent statements by a witness are admissible for both impeachment purposes and as substantive evidence. Title 14, section 19 of the Virgin Islands Code provides in relevant part:

> Evidence of a prior statement, oral or written, made by a witness is not made inadmissible by the hearsay rule if the prior statement is inconsistent with his testimony at a hearing or trial. After the witness has been given an opportunity at such hearing or trial to explain or deny the prior statement, the court shall allow either party to prove that the witness has made a prior statement, oral or written, inconsistent with his sworn testimony. <u>Such prior statement shall be admissible for the purpose of affecting the credibility of the witness or for proving the truth of the matter asserted therein if it would have been admissible if made by the witness at the hearing or trial.</u>

14 V.I.C. § 19 (emphasis added). The statute does not condition admissibility on a showing that the statement was adopted by the witness, *see id.,* and there appears no other sound basis for imposing such a requirement for a prior *oral* statement. *See e.g., Jankins v. TDC Management Corp., Inc.,* 305 U.S. App. D.C. 342, 21 F.3d 436, 442 (D.C. Cir. 1994) (holding, in applying federal evidentiary rules, that the court erred in prohibiting cross examination of a witness regarding an oral statement made to an attorney that the attorney had written down, noting that, "An oral statement—in itself—obviously cannot be 'signed' or 'adopted', [sic] and it would be illogical (and, indeed, bizarre) to bar the use of a prior oral statement for impeachment because there happened to be written evidence of it.") (internal parenthetical in original); *compare Plair v. Pennsylvania Bd. of Probation and Parole,* 104 Pa. Commw. 297, 521 A.2d 989, 990 (1987) (permitting testimony

by two police officers to contradict witness' prior statement inculpating the defendant); *cf. California v. Green*, 399 U.S. 149, 151-152, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) (testimony of prior statement made to police officer was admissible; noting that the opportunity for cross-examination at trial with respect to both present and past versions of the event is adequate to make equally admissible "both the casual, off-hand remark to a stranger, and the carefully recorded testimony at a prior hearing"); *United States v. McQueen*, 458 F.2d 1049, 1053 (3d Cir. 1972) (noting trial court did not err in permitting police officers to testify to statements made by one defendant during course of interrogation where defendant insisted that he had told the officers nothing, and the prosecution maintained that it was offering evidence of the admissions solely to attack that defendant's credibility).

At trial, the government questioned Taylor regarding her statements to police, including the statements which were the subject of Detective Brown's testimony. After giving Taylor an opportunity to explain or deny the statement, the government offered the rebuttal testimony, in which Detective Brown recounted what Taylor had told him regarding her personal observations at the scene of the crime. Admission of this testimony was not improper under the plain language of 14 V.I.C. § 19.

Moreover, Brown's rebuttal testimony on that issue mirrored the version of events provided by both John-Baptiste and Constant. Therefore, Taylor's statement that Newton drove his car after Gray during the initial altercation was merely cumulative evidence. *See Mitchell*, 365 F.3d at 253 (noting improper admission of cumulative evidence is generally harmless error).

### III. CONCLUSION

Viewing the evidence in the light most favorable to the Government, as we must, we find the evidence presented at trial sufficient to support Newton's conviction for second degree murder. The appellant's additional arguments also present no basis for reversing his conviction. Therefore, for the reasons earlier stated, we will affirm the trial court's denial of Newton's motion for judgment of acquittal.