**GOVERNMENT OF THE VIRGIN ISLANDS, Appellant**

**v.**

**MELONIE ADAMS-TUTEIN, Appellee**

D.C. Crim. App. No. 2001/063

District Court of the Virgin Islands

Division of St. Croix

June 27, 2005

RICHARD DAVIS, AAG, St. Thomas, U.S.V.I., *Attorney for Appellant.*

MICHAEL JOSEPH, ESQ., St. Croix, U.S.V.I., *Attorney for Appellee.*

FINCH, *Chief Judge, District Court of the Virgin Islands*; GOMEZ, *Judge of the District Court of the Virgin Islands*; and HODGE, *Judge of the Superior Court, Sitting by Designation.*

## MEMORANDUM OPINION

(June 27, 2005)

Mellonie Adams-Tutein ["Adams-Tutein" or "appellee"] was convicted by a jury of one count of obtaining money by fake pretense, in violation of title 14, section 834(2) of the Virgin Islands Code. Following the jury's verdict, the trial court granted the appellee's earlier motion for judgment of acquittal, citing insufficiency of the evidence to support the conviction. The Government appeals the trial court's order granting

judgment of acquittal and presents the following issues for review: 1) whether the court erred in finding the Government failed to prove all of the essential elements of the crime; 2) whether the court failed to preserve its decision on the motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(b); and 3) whether the trial court erred in overturning the jury's verdict of guilt and replacing it with its own.

For the reasons which follow, we will affirm the trial court's order granting judgment of acquittal based on the insufficiency of evidence at trial to establish the essential elements of the crime.

## I. STATEMENT OF FACTS & PROCEDURAL POSTURE

The appellee was employed full-time with the Virgin Islands Department of Justice as a legal secretary. [Trial Transcript ("Tr.") at 57-59]. As such, she was expected to work from 8:00 a.m. to 5:00 p.m., Mondays through Fridays, and was assigned to serve as support staff for at least three attorneys: Marie John-Drigo, Paulete Frazier-Alexis, and Charlotte Poole-Davis. [Tr. At 57-58, 148-50, 151-52].

From May through July, 2000, Adams-Tutein also assumed a field position with the V.I. Census Bureau. That position involved flexible hours and required Adams-Tutein to conduct field interviews and questionnaires in connection with the 2000 census. [Tr. at 68-73, 113-121].

During the period May through July, 2000, one of the attorneys to whom Adams-Tutein was assigned, Attorney Marie John-Drigo ("Attorney John-Drigo"), became concerned with her frequent disappearances and absences from her workstation. [Tr. at 24-4 0]. Daniel Matarangas-King ("Attorney Matarangas-King"), testified that because of the proximity of his office to Adams-Tutein's desk, he was also often aware of Adams-Tutein's absences from her workstation and Attorney John-Drigo's efforts to locate her. [Tr. at 43-44, 50-51].[1]

---

[1]    The two other attorneys with whom Adams-Tutein was assigned painted a different picture of her as a reliable, hard-working employee who was always available to complete her assignments. Both testified in the defense's case.

Attorney Charlotte Poole-Davis testified that the appellee was assigned as her secretary from about December, 1999 up to the time the appellee was charged in 2000, including the periods charged in the information. [Tr. at 152]. She testified that during that time, the appellee performed very well and she had no problems with

### July 6, 2000

Attorney John-Drigo testified that, as a result of the appellee's disappearances, she had to complete some administrative work herself or ask another secretary to do so in order to meet deadlines on at least two occasions. [Tr. at 24-28]. One of these incidents, where Attorney John-Drigo affirmatively testified she could not locate Adams-Tutein in the office for several hours, was on July 6, 2000. [*Id.*]. She could not pinpoint other days, and this was the only testimony regarding Adams-Tutein's conduct on July 6, 2000.

In addition to that testimony, the prosecution introduced evidence from the Census Bureau showing that Adams-Tutein had submitted timesheets reflecting eight hours of work for July 6, and attesting that the times worked on that day were 12:00-4:00 and 5:00-9:00.[2] [Exh. 3]. The copies of the exhibit submitted to this Court reflecting the Justice Department's timesheet for that day is unreadable; however, the prosecution argued at trial that the appellee was also paid by the Justice Department for that day.

Each agency testified that the hours submitted were to reflect the times worked and that, as long as there was no record of the employee complaining of non-payment, the employee was presumed to have been paid according to those hours. [Tr. at 60-61, 115-16].

Manuel Thomas, Personnel Human Resources Director for the University of the Virgin Islands, who kept employment records for 2000 Census employees, also testified that time records submitted by Adams-Tutein were required to be an accurate reflection of actual work times, and he added that employees were routinely paid once timesheets were submitted to the payroll department. [Tr. at 70-74; see also 115-16].

### July 13, 2000

On July 13, 2000, Attorney John-Drigo again could not find the appellee at her workstation. On that day, Adams-Tutein was seen by Attorney Matarangas-King, sometime around 1:00 p.m. working at a

---

disappearances. [Tr. at 154-57]. Attorney Paulette Frazier-Alexis similarly testified that Adams-Tutein was assigned to work with her as a secretary during July 2000, and that she encountered no problems with productivity. [Tr. at 148-50].

[2]    This was presumably from 12:00 p.m.; however, Census officials noted employees were not to record whether their times were a.m. or p.m.

table with the Census in front of the V.I. Community Bank in downtown Christiansted. [Tr. at 45-48]. Adams-Tutein was wearing jeans and a Census t-shirt. [Tr. at 48]. Upon returning to the office and learning that Adams-Tutein's supervisor had been inquiring about her whereabouts, Attorney Matarangas-King reported that information to Attorney John-Drigo.

Adams-Tutein submitted a form requesting sick leave for July 13. That leave request form was signed by a supervisor, and the government argued she was paid for that day. Timesheets from the Census reflected that Adams-Tutein claimed to have worked 12 hours, from 8:00-2:00 and 2:30-8:30, on July 13, 2000—the same day for which she claimed sick leave from the Justice Department. The sick leave form, as well as the timesheets, were admitted at trial.

### July 27, 2000

Kaj Christopher ("Christopher"), the Financial Control Officer at the Department of Justice, testified that Adams-Tutein similarly submitted a request for sick leave to the Justice Department for July 27, 2000, which was approved. Timesheets submitted to the Census reflected she performed five hours of work on that day, from 3:00-8:00.

### Charges

In August, 2000, a criminal information was filed charging Adams-Tutein with three counts of obtaining money by false or fraudulent representation or pretenses, under 14 V.I.C. § 834(2). Those counts covered various periods from May to July, 2000. On motion for dismissal at trial based on the government's inability to pinpoint specific dates and times when Adams-Tutein could not be found for the periods covered in counts I and II, the trial court dismissed those counts. [Tr. at 99-101]. In dismissing those counts, the court noted the absence of evidence beyond a reasonable doubt that the timesheets submitted to the government, as opposed to that of the Census, were false, and the inability of the government to cite specific dates Adams-Tutein is alleged to have falsely represented the times worked during the periods covered in Counts I and II. [*Id.*].

However, the court denied the motion to dismiss as to Count III, applicable to July 6, 13 and 27. The court noted that a jury could find that the appellee had fraudulently certified to being ill, where the

appellee submitted a sick leave form for July 13 and 27 and was recorded as having worked with the Census, and where she was seen working at another job on July 13. [Tr. at 101-06]. The court further stated that Attorney John-Drigo's testimony that she could not find Adams-Tutein at work on July 6 was sufficient to permit a jury to find that the appellee had falsely claimed time for periods she had not worked. [*Id.* at 107]. Although initially appearing to deny the motion to dismiss as to Count III, the court later stated it was reserving judgment on the motion:

> The motion to dismiss Count Three of the Information will be denied. There is sufficient evidence, that if it is to be believed by the jury, for the jury to find that specifically on or about the 13th day of July, and or about the 27th of July, that a claim was submitted with intent to defraud.

> Even then, the Court will take it under advisement also and submit the matter to the jury.

[Tr. at 164].

Following trial, the jury returned a verdict of guilt on Count III, the only surviving count, and found that Adams-Tutein had obtained $240 based on her false representations. [*See* Joint Appendix ("J.A.") at 4]. The court subsequently issued a written order granting the appellee's motion for judgment of acquittal, on grounds the government's proof was insufficient to sustain the conviction because of its failure to produce pay stubs evidencing payment. [J.A. at 8-10]. This timely appeal followed.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Our jurisdiction to consider this appeal arises under The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004), which repealed 4 V.I.C. §§ 33-40, and reinstating appellate jurisdiction in this Court).[3]

We generally review findings of fact for clear error, and review *de novo* the trial court's determinations of law, construction of statute, or application of legal precepts. *See Poleon v. Government of the V.I.*, 184

---

[3] Our jurisdiction in this regard was previously provided under 4 V.I.C. § 39(c).

F. Supp. 2d 428 (D.V.I. App. Div. 2002); *Bryan v. Government of the V.I.*, 150 F. Supp. 2d 821, 827 n.7 (D.V.I. App. Div. 2001).

■ We afford plenary review to questions regarding the sufficiency of evidence at trial. *See Virgin Islands v. Sampson,* 94 F. Supp. 2d 639, 643, 42 V.I. 247 (D.V.I. App. Div. 2000). Our inquiry on a sufficiency of the evidence challenge focuses on whether there was substantial evidence which, viewed along with all reasonable inferences which may be drawn therefrom in the light most favorable to the verdict-winner, would permit a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Id.* (citations omitted). In passing on this question, we are not to weigh evidence or second-guess the jury's credibility determinations. *See Lewis v. Government of the Virgin Islands*, 77 F. Supp. 2d 681, 684, 42 V.I. 175 (D.V.I. App. Div. 1999); *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992). "A defendant challenging the sufficiency of the evidence bears a heavy burden," and only "when the record contains no evidence, regardless of how it is weighted, from which a jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Casper*, 956 F.2d at 421; *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) (citation and internal quotations omitted).

## B. The Trial Court Did Not Err in Granting Judgment of Acquittal.

Whether the trial court erred in its determination that the Government failed in its burden to prove the essential elements of the crime and whether the trial court improperly replaced the jury's verdict of guilt with its own, as presented in issues one and three above, are inextricably intertwined and will be discussed together here.[4]

■ In a criminal prosecution, the government bears the burden to prove the charged crimes and must adduce evidence sufficient to permit a reasonable jury to find guilt beyond a reasonable doubt as to each

---

[4] The issue regarding the trial court's failure to preserve the decision on Rule 29 is utterly without merit and requires little discussion. While not an exemplar of clear language, the trial court's oral ruling communicated that it intended to reserve judgment on the Rule 29 arguments, as permitted under FED. R. CRIM. P. 29(b), despite statements regarding the court's assessment of the evidence. Indeed, reserving decision on such motions during trial is now the preferred method to preserve the prosecution's right to appeal its verdict without facing a certain double jeopardy challenge if a new trial were warranted upon later reversal. *See* FED. R. CRIM. P. 28 advisory committee notes.

element of those crimes. *See Government of the V.I. v. Morris,* 191 F.R.D. 82, 85, 42 V.I. 135 (D.V.I. App. Div. 1999); *In re Winship,* 397 U.S. 358, 362, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). While that standard does not require that evidence at trial be such that it forecloses all possibilities other than that of guilt, there must nonetheless be evidence from which a rational trier of fact could find guilt beyond a reasonable doubt, and the jury's verdict may be disturbed only where the prosecution clearly fails to satisfy that burden of proof. *See Sampson,* 94 F. Supp. 2d at 643; *Casper,* 956 F.2d at 422.

In granting the motion for judgment of acquittal, the trial court held that the evidence was insufficient to sustain a conviction where the government failed to produce pay records or cancelled checks to corroborate testimony that the appellee had obtained payment and actually cashed checks for the periods in question. [J.A. at 8-9]. In assessing the evidence adduced at trial on this point, the trial court noted:

> The testimony of Kaj Christopher from the Department of Justice in St. Thomas merely establishes that he was the person responsible for processing the time sheets submitted for payment during the relevant pay period and that he had processed the times [sic] sheets in this particular instance as usual. He further testified that, to his knowledge, the records did not reflect that the defendant ever complained that she had not been paid during the relevant time period. However, even considering Christopher's testimony in the light most favorable to the Government, his testimony fails to establish beyond a reasonable doubt that the relevant paychecks were indeed sent by the Department of Finance to the defendant and that she had cashed the checks upon receipt thereof. Clearly, the jury was left to speculate based upon life experiences that when Christopher processed the paperwork, the defendant must have been paid; and that because Christopher stated that the defendant made no complaints of payment, she must have cashed the checks.

> However, the Government, as a matter of law, was reasonably required to produce pay records or the canceled checks to corroborate · Christopher's testimony in order to meet its high burden of proof ... . Hence, while the jury may have astutely speculated that the defendant <u>must</u> have been paid for the time submitted based upon the testimony of Kaj Christopher, the jury, in

the absence of any such corroborating evidence, lacked the requisite legal certainty to find that the defendant <u>obtained</u> money under false pretenses as charged. Therefore, as a matter of law, the defendant Melonie Adams-Tutein is entitled to an acquittal.

[J.A. at 9] (emphasis in original) (internal citation and parenthetical omitted). While we do not reach the issue as to the specific evidence the government should have presented, we agree with the trial court's assessment of the evidence as inadequate to satisfy the government's burden of proof.

█ The statute under which the appellant was charged makes it a crime to "knowingly and designedly, by false or fraudulent representation or pretenses, defraud[] any other person of money or property." V.I. CODE ANN. tit. 14, § 834(2). Thus, to sustain a conviction, the government was required to prove that Adams-Tutein knowingly submitted false statements with the specific intent to defraud the victim, and that she actually defrauded the victim by obtaining some benefit as a result of the false representation. *See Virgin Islands v. Carmichael*, 45 V.I. 33 (Terr. Ct. 2002), *aff'd*, 2004 U.S. Dist. LEXIS 27368 (D.V.I. App. Div. 2004) (noting the defendant must have benefitted from the fraud, to the victim's detriment); *cf.*, RESTATEMENT (SECOND) OF TORTS §§ 537-546 (1976) ; *Field v. Mans*, 516 U.S. 59, 70-71, 133 L. Ed. 2d 351, 116 S. Ct. 437; *Government of the V.I. ex rel. C.C. v. A.P.*, 36 V.I. 14, 21 (Terr. Ct. 1995) (all discussing elements of civil fraud under the common law, and noting that conduct amounting to fraud by misrepresentation or false pretenses similarly requires proof of reliance on the misrepresentation or an inducement to act).

██ Here, the criminal statute does not define false or fraudulent representations or what constitutes "defraud[ing]" another for purposes of the statute. In the absence of definitions in the statute, we are instructed to construe terms according to their common meanings. *See* 1 V.I.C. § 42. As used in the statute, and consistent with the common law construction of fraud, a person "defrauds" another if he makes "a misrepresentation of an existing material fact, knowing it to be false, ... intending one to rely and under circumstances in which such person does rely to his damage." BLACK'S LAW DICTIONARY 423 (6th ed. 1990). Therefore, to complete the crime of obtaining money under false pretenses or fraudulent representation, the statutory requirement that

another person must have been defrauded imports the requirement that another conferred a benefit or turned over something of value to the actor in reliance on the misrepresentation. *See e.g., Carmichael v. Gov't of the V.I.*, 2004 U.S. Dist. LEXIS 27368 (D.V.I. App. Div. Nov. 29, 2004) (noting that,"The linchpin of this offense is the use of fraud or trickery to obtain another's money or property."); 32 AM. JUR. 2D *False Pretenses* § 47 (crime of obtaining money by false pretenses requires showing that the defrauded party relied on the misrepresentation by the defendant and was actually deceived). *A fortiori,* mere utterance of a false statement or misrepresentation must necessarily be found insufficient to constitute a crime under section 834. There must be proof that the misrepresentation induced another to confer something of value to the person making the misrepresentation.

At trial, the government presented the testimony of Christopher, whose duty it was to pay the bills and the payroll for the Justice Department. [Tr. at 54]. He testified the appellee was employed as a legal secretary, at a salary of $10.50 or $10.51 per hour, and was a full-time employee obligated to work from 8 a. m to 5 p.m. [Tr. at 57-59]. As part of his duties, Christopher reviewed time and attendance sheets submitted by employees of that department, through their respective office managers, and submitted the appropriate time to the Department of Finance for payment. [*Id.* at 55-56, 59-61]. Those timesheets were expected to reflect the hours worked for each two-week pay period, as well as leave slips for times absent. [*Id.* at 55-59]. Christopher testified that the Department of Finance issued pay checks in accordance with the times submitted by his agency and explained the procedure as follows:

Q   In terms of those figures, how is a paycheck generated with the Department of Finance, whatever, the Finance Department?

A   Those time sheets are then reviewed by myself and then entered on the time, the larger time and attendance report by the Department of Finance. And then they are entered on the computer and then submitted to the Department of Finance.

Q   After the records go to Finance, in terms of getting the paycheck generated for St. Croix, how does a paycheck end up going to St. Croix?

523

A   After the time and attendance is submitted to the Department of Finance, the department's technician reviews to confirm the actual entries in the system to what is on the time and attendance report. After that is done, they do a check run. And then after that, I believe St. Croix, they get their checks come over either the pay day week, which will be the Thursday or the Wednesday.

Q   Where do the checks get delivered to?

A   They are delivered to the Department of Justice, St. Croix.

Q   Do they pass—do they ever come back to you?

A   No.

[Tr. At 59-60]. Christopher added that employees were paid in accordance with the times submitted and, if not so paid, would have been required to initiate a complaint:

Q   If the circumstances arises where a person's check is incorrect, or a check is missing, who would take care of that?

A   Myself. Because the checks go to St. Croix, but however, the payroll register which is the—actually it's identical to your check stubs except for your annual and sick leave used, that returns back to the St. Thomas office which I am.

Q   So during the period of time from pay period ending May 20, to pay period ending July 29 of the year 2000, for Ms. Tutien [sic] you would have been responsible for making your sure [sic] those checks were made to her also?

A   Yes.

Q   During those period of time, as far as you know, were checks paid to her?

A   Yes.

Q   Did you get any complaint from anybody in the office, or from her, that they didn't receive their checks during that time?

A   No.

[Tr. at 61].

■ Christopher's testimony established only that timesheets were processed by the agency and then submitted to the Department of Finance for payment. His testimony that an employee is presumed to have been paid by Finance in accordance with the timesheets submitted, unless the agency receives a complaint to the contrary, leaves much to speculation and is insufficient to establish that Adams-Tutein actually obtained payment for the times in question. From the testimony and the documentary evidence presented, a jury could not reasonably find, beyond a reasonable doubt, that Adams-Tutein actually obtained payment as a result of any false representations, an essential element of the charged crime.[5]

---

[5] Our decision today is not intended to set forth a bright-line rule requiring admission of direct documentary evidence of payment or evidence corroborative of testimony at trial to satisfy the proof required for a charge under section 834(2) in all instances, or to diminish the force of circumstantial evidence. *See United States v. Perez*, 280 F.3d 318, 344 (3d Cir. 2002); *Fahie v. Gov't of the V.I.*, 273 F. Supp. 2d 657, 659 (D.V.I. App. Div. 2003) (noting that circumstantial evidence is no less probative than direct evidence). Indeed, we reject the trial court's suggestion in that regard and find its reliance on *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030 (3d Cir. 1987) for that proposition misplaced.

In *Martin Marietta,* the Court was faced with a large jury award in a negligence claim against an employer for debilitating back injuries the employee suffered when he fell on the job. *See Martin Marietta*, 817 F.2d at 1037-39. The measure of economic damages based on lost future earnings required a determination of the employee's past earning capacity and the extent to which that earning capacity for his occupation was diminished. *See id.* The employer found objectionable the computation of plaintiff's lost earnings based on what it termed an improper assumption of the economic expert that the plaintiff regularly worked a 40-hour week and without submission of income tax returns to establish the true earning capacity prior to injury. *Id.* at 1038. The Court held that, while "self-serving statements may not be enough to support an award of lost income, in this case plaintiff introduced sufficient corroborating evidence in the form of testimony based on the employer's pay records." *Id.* (Citations omitted). The corroborating evidence to which the Court referred was testimony of the personnel manager of the subcontractor who maintained records of its employees working on the Martin Marietta site, and who testified to the employee regularly working a 40-hour work week and to the rate of pay. *Martin Marietta,* therefore, offers nothing to support the proposition that testimonial evidence alone, without corroborating check stubs, cannot sufficiently prove the actor actually obtained money.

Rather, the evidence in each case must be individually assessed to determine whether, taken as a whole, it satisfies the government's burden to prove the essential elements of the crime beyond a reasonable doubt.

## III. CONCLUSION

We hold the trial court did not err in determining that evidence at trial was insufficient to sustain the appellee's conviction for obtaining money under fake pretenses and, accordingly, affirm that court's judgment of acquittal.