**WILLIS TODMANN, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S.Ct. Criminal No. 2012-0078

Supreme Court of the Virgin Islands

October 15, 2013

MICHELLE BAKER, ESQ., TRESTON E. MOORE, ESQ., Moore, Dodson, & Russell, P.C., St. Thomas, USVI, *Attorneys for Appellant*.

KIMBERLY L. SALISBURY, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(October 15, 2013)

SWAN, *Associate Justice*. Willis Todmann was charged with several crimes, including obtaining money by false pretenses, forgery, and fraud, for obtaining an unauthorized additional salary while serving as Acting Administrator and Administrator of the Government Employees' Retirement System. Todmann asserts that a new trial is warranted because a number of errors were committed during the trial, including the trial court allowing jurors to ask questions during the trial, and the trial court's failure to remove a juror who submitted a question allegedly manifesting bias towards the defense. Todmann also asserts that the evidence was insufficient to convict him of any count in the Information. Because we find insufficient evidence on one count of the Information, we reverse one of Todmann's convictions for obtaining money by false pretenses. We affirm all other convictions.

## I. FACTS AND PROCEDURAL HISTORY

Willis Todmann was first employed as the assistant Administrator of the Virgin Islands' Government Employees' Retirement System

("GERS"). Shortly after, his title was changed to Chief Financial Officer ("CFO"). As CFO, Todmann reported to the Administrator for the GERS. In November of 2004, the Administrator resigned; therefore, the position became vacant. The Board of Directors of the GERS ("Board") promptly appointed Todmann to be the acting Administrator of the GERS until the position could be filled. It is normal procedure for the assistant Administrator to be appointed as acting Administrator when the Administrator is temporarily absent or the position is vacant.

In 2000, the Board passed GERS Resolution No. 03-2000, allowing acting administrators to collect their regular salaries plus 15 percent of the Administrator's salary to compensate for the additional duties when an assistant Administrator temporarily performs the duties of acting Administrator for a period exceeding 10 days. (J.A. at 124-26.) Therefore, Todmann received his regular CFO salary and 15 percent of the Administrator's salary. (J.A. at 230.) Despite being authorized by GERS Resolution No. 03-2000, the increase to Mr. Todmann's salary as acting Administrator was first submitted to and approved by the Board before being implemented. (*Id.* at 146.) Todmann thus served in the capacity of CFO, while simultaneously serving as Administrator.

In December 2005, Todmann delivered a memorandum to the Director of Human Resources Division of the GERS ("Human Resources") that appeared to authorize additional compensation to him as the CFO. (J.A. at 234-41.) The memorandum was given specifically to Janice Turnbull, Director of Human Resources. At the time the memorandum was issued, Todmann was temporarily serving as acting Administrator and was receiving his regular salary as CFO in addition to 15 percent of the Administrator's salary. (*Id.* at 236-37.) The December 2005 memorandum was purportedly from Todmann to Carver Farrow, the then Chairperson of the Board of the GERS, requesting additional compensation for his duties as CFO. Pursuant to the December 2005 memorandum Todmann would simultaneously collect two full salaries: one salary as CFO and another salary as Administrator. The memorandum appeared to be signed and approved by Farrow. (*Id.* at 240.) Farrow was unaware of the extra salary Todmann was receiving and unaware of the existence of the memorandum which bore his purported signature. (*Id.* at 436-37.)

Human Resources and the Payroll Division of the GERS processed an additional salary for Todmann under the distinct impression that the additional salary to Todmann was approved by the Board and proceeded

to generate for Todmann a second Notice of Personnel Action (NOPA). The Board approved a salary of $127,905 for Todmann, which was the total of the CFO's salary plus 15 percent of the Administrator's salary. (J.A. at 230.) After the additional salary was processed, Todmann's income, including retroactive payments, more than doubled to $370,588. (J.A. at 384.) His new salary became $236,656 (J.A. at 251-52, 260-64). Subsequently, in June of 2006, the Legislature confirmed the appointment of Todmann to the position of Administrator. (J.A. at 414-15.) Although promoted to Administrator, Todmann continued receiving his full CFO salary without the Board's knowledge. Although as Administrator Todmann reported directly to the Board, the Board was not responsible for the daily operations of the GERS. Rather, it was Todmann who was responsible for the GERS's daily operations.

As the Board's treasurer and acting CFO, Todmann was responsible for submitting an annual proposed fiscal year budget to the Board. (J.A. at 398, 452.) The budget includes a list of employees' salaries. Positions listed in the budget as "vacant" gave an assurance to the Board that no salary was being paid for those positions, and that the funds for the positions were available. (J.A. at 799.) Todmann submitted a 2007 proposed budget to the Board listing the CFO position as vacant, although Todmann was being paid a full CFO salary. The submission of the proposed fiscal year 2007 budget with the CFO position listed as "vacant," further caused the Board to be oblivious to the fact that Todmann was receiving an additional full salary as CFO. On February 5, 2007, the Board executed a resolution which merged the duties of the Administrator and the CFO without additional compensation. (J.A. at 269.)

Sometime in early 2007, Farrow was informed that Todmann was receiving two salaries. (J.A. at 416-17.) Investigations into Todmann's two salaries were conducted and executive meetings were subsequently held by Farrow and the Board at which it was confirmed that Todmann was receiving two salaries. The Board confronted Todmann about the basis for his two salaries, and Todmann responded that he had two NOPAs and that he would not answer any further questions without his attorney being present. The Board passed GERS resolution No. 01-2007 to discontinue the extra salary to Todmann. (*Id.* at 426-27, 783.) Thereafter, Todmann submitted a letter to the Board, resigning his position of Administrator. (*Id.* at 432-34.)

A Board member referred the matter to the Department of Justice, which conducted its separate investigation into the matter of Todmann receiving two salaries. (*Id.* at 440.) Until the time of the Attorney General's investigation, Farrow was unaware of the existence of the memorandum with his alleged signature purporting to give approval for Todmann to receive an additional salary as CFO. (J.A. at 438-40.) Farrow had never seen the memorandum before he was approached about it by investigators from the Department of Justice. Farrow was off-island on the date written on the memorandum which purports to be its date of issuance. (*Id.* at 441.) Farrow insisted that the signature at the bottom of the memorandum was not his signature. (*Id.* at 443.)

On October 29, 2007, Austin Nibbs became the new Administrator for GERS. (J.A. at 615.) Nibbs received a November 27, 2007 correspondence from Citicorp, a credit card company, requesting a financial statement from GERS as Citicorp attempted to update an account for a Diners Club credit card held by Todmann. (*Id.* at 619.) When Nibbs inquired of the accounting division of the GERS as to whether there was a Diners Club card account with the GERS, he was told there was none. (*Id.* at 620.) Todmann was the only authorized user of the card. (*Id.* at 645.) Nibbs confirmed that the Diners Club card was a corporate account obtained on GERS' credit, but that account statements for the Diners card account were not held in GERS's accounting division's records. Therefore, Nibbs wrote a letter dated December 21, 2007 to Citicorp, the organization that issues Diners Club corporate cards, requesting information concerning the status of the Diners Club account. (*Id.* at 623-24.) Citicorp responded informing that the account was still open and active. Nibbs informed Citicorp that Todmann was no longer an employee of GERS and requested that the account be closed. (*Id.* at 637-38.) Citicorp stated that the account could not be closed until the balance in excess of $6,000 was liquidated. (*Id.* at 640-41.) Todmann paid the balance on the Diners Club credit card, and the account was closed.

Subsequently, Todmann was charged in a Second Amended Second Superseding Information as follows: Count I — obtaining money by false pretenses for "fraudulently obtain[ing] an unauthorized additional salary by fraudulently submitting a memorandum that gave the false and misleading impression that the additional salary or compensation was authorized and approved by the GERS Board of Trustees when in fact it was not," in violation of 14 V.I.C. § 834(2); Count II — forgery for

"submit[ting] to the [GERS] Board of Trustees, the Fiscal Year 2007 GERS proposed budget falsely reflecting the [CFO] position as 'vacant' with no salaries paid, when Defendant was actually receiving a salary for said position in addition to the Administrator or Acting Administrator", in violation of 14 V.I.C. § 791(2); Count III — penalties for fraud for "submit[ting] a Fiscal Year 2007 budget record to the GERS Board of Trustees, in which he fraudulently concealed the fact that he was receiving full salaries for two different positions by falsely showing a position for which he was receiving pay as 'vacant' with no salaries paid" in violation of 3 V.I.C. § 724(a); Count IV — embezzlement by fiduciaries for fraudulently appropriating property which he was entrusted to control as a trustee, agent or assignee "to a use or purpose not in the due and lawful execution of his trust by collecting and causing himself to be paid additional salaries or compensation in excess of one hundred dollars without authorization of the GERS Board of Trustees" in violation of 14 V.I.C. §§ 1091 and 1094(2); Count V — grand larceny for stealing, taking or carrying away "money belonging to the [GERS], with the intention of depriving the owner thereof, by unlawfully collecting unauthorized monetary compensation from the GERS payroll in excess of one hundred dollars" in violation of 14 V.I.C. §§ 1081(a) and 1083(1); and Count VI — obtaining money by false pretenses for "fraudulently obtaining personal goods and services using a Diners Club corporate credit card issued on the credit of the [GERS] without authorization from the GERS" in violation of 14 V.I.C. § 834(2). (J.A. at 20-22.) After a jury trial, Todmann was acquitted of Count IV, but found guilty of all other counts.

Todmann was sentenced to two years of imprisonment on Count I. For Count III, Todmann was sentenced to a mandatory period of five years' incarceration.[1] For Count VI, Todmann was sentenced to five years of imprisonment, all of which is suspended. All sentences imposed were ordered to be served concurrently with each other and with credit for time served in pre-trial incarceration. (J.A. at 17-19.)

---

[1] The sentences for Counts II and V were stayed because the charges are identical to Counts III and I respectively.

## II. JURISDICTION

Title 4, section 32(a) of the Virgin Islands Code provides, in pertinent part, that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." Accordingly, we have jurisdiction over this appeal.

## III. ISSUES AND STANDARD OF REVIEW

On appeal, Todmann alleges A) that the trial court abused its discretion by allowing jurors to question witnesses, B) that the trial court erred in refusing to remove a juror whose question inferred a premature conclusion of guilt, and C) that the trial court erred in denying his Motion for Judgment of Acquittal because the evidence is insufficient to support his convictions.

We review a trial court's evidentiary decisions only for abuse of discretion. *Fontaine v. People*, 56 V.I. 571, 577-578 (V.I. 2012). If the decision involves the application of legal precepts we exercise plenary review. *Id.* In reviewing a trial court's denial of a motion for judgment of acquittal based on the sufficiency of the evidence, we apply a "particularly deferential standard of review." *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009); *United States v. Bansal*, 663 F.3d 634, 665 (3d Cir. 2011). An appellant has a very heavy burden in advancing an insufficiency of the evidence claim. *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009). We must affirm a jury's verdict as long as substantial evidence was presented at trial to allow a rational trier of fact to convict when the evidence is viewed in a light most favorable to the People. *United States v. Wright*, 665 F.3d 560, 567 (3d Cir. 2012); *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009). Thus a finding of insufficiency of the evidence should be confined to those cases where the prosecution's failure to establish the elements of the crime is clear. *United States v. Smith*, 294 F.3d 473, 476-77 (3d Cir. 2002).

## IV. DISCUSSION

### A. Jury Questions

Todmann relies on our decision in *Fontaine v. People*, 56 V.I. 571, 591-96 (V.I. 2012), to support his contention that the trial court's allowance of jury questions in the examination of witnesses constituted reversible error. In *Fontaine* we held that permitting the jury to question

934

witnesses, in the absence of procedural safeguards or written court procedures regulating the practice, was error. 56 V.I. at 594. The procedural safeguards of particular concern to us in *Fontaine* were a) the inability of counsel to object to questions outside the presence of the jury, thus forcing counsel to choose between permitting questions counsel believe should not be asked, or appearing confrontational with the jury, and b) permitting jurors to ask clarifying questions of witnesses directly without the trial judge serving any gatekeeping function prior to the question being asked. *Id.* at 594-95.

Other procedural safeguards have been emphasized in other jurisdictions. For instance, courts are encouraged to give parties forewarning of the intention to allow jury questions to provide parties an opportunity to oppose the practice or to suggest a procedure to follow. 98 C.J.S. *Witnesses* § 488 (collecting cases). An opportunity for counsel to further examine witnesses after a juror question is also a recommended practice. *Id.*

While in this case there were no established court procedures ensuring uniformity and regulation of the practice of jurors' questioning, the trial court did implement some safeguards that were absent in *Fontaine*. In *Fontaine*, the trial court allowed jurors to ask witnesses any verbal question they wished without any prior scrutiny of the questions by the parties' counsel or by the trial court. By contrast, the jurors in Todmann's trial were not permitted to ask questions directly. Here, jury questions were first submitted to the trial court in writing. The trial judge then scrutinized the questions for appropriateness before they were asked of witnesses during their testimony. The trial judge also notified both parties in the preliminary instructions of the trial court's intention to allow jury questioning. (J.A. at 79.) Counsel were also afforded the opportunity outside the purview of the jury to object to the procedure of allowing jury questioning. (J.A. at 192-94.) While we acknowledge that the trial court went further in implementing some procedural safeguards in the juror's questioning of witnesses than did the trial court in *Fontaine*, the trial court did not employ sufficient and adequate safeguards that would protect an important right of the defendant.

■ Trial counsel in the present case were confronted with the dilemma that we cautioned against in *Fontaine* where counsel were forced to choose between allowing jurors' questions to be asked to which counsel could not object, or object in open court and appear to be confrontational

with the jurors.[2] Here, the trial court scrutinized each question submitted by the jury; however, counsel were not allowed to preview or scrutinize the jurors' questions, nor were they allowed to object to the questions outside of the jury's presence or at a side bar conference. This lack of procedural safeguards added to the absence of any Superior Court rules regulating the practice of allowing jurors to ask questions of witnesses leads us to conclude that the use of juror questioning under the circumstances of this case was error. Nonetheless, evidentiary errors are subject to a harmless error analysis in which we determine whether the substantial rights of the defendant were affected, and whether the error had a significant influence on the verdict. *Browne v. People*, 56 V.I. 207, 225 (V.I. 2012).

Todmann has not demonstrated that the questions asked by the jurors directly prejudiced him or violated any rule of evidence, and we do not find that they did. The questions were limited and controlled, and were asked only after the trial court's review of each question. *United States v. Lewin*, 900 F.2d 145, 147-48 (8th Cir. 1990) (because jury questions were specific and factual in nature, merely sought clarification of previous testimony, and were not addressed to any of defendants, the trial court did not abuse its discretion in permitting jurors to question witnesses). *See also United States v. Bush*, 47 F.3d 511, 516 (2d Cir. 1995). The trial court performed its gate-keeping functions, unlike in *Fontaine*, thereby reducing the potential for an inappropriate question to be asked.

█ Although the juror's questions were limited, controlled, submitted in writing, and scrutinized by the trial judge, we emphasize that employing such procedural safeguards alone is not sufficient to dispel the harm that can be caused by permitting the haphazard use of jury questioning in the absence of court rules and established procedures that ensure uniformity and regulation of the practice. *See United States v.*

---

[2] Specifically we held that:

First, by not permitting counsel for both parties to, outside the presence of the jury, review and object to specific juror questions before they were asked, counsel for both Fontaine and the People were forced to decide between objecting to a juror's question in open court — thus placing counsel "in a direct adversarial role with respect to the jury," *United States v. George*, 986 F.2d 1176, 1179 (8th Cir. 1993) — or permitting, without any objection, a witness to answer a question that, in the opinion of counsel, the witness should not be permitted to answer.

*Fontaine*, 56 V.I. at 594-95.

*Hernandez*, 176 F.3d 719, 725 (3d Cir. 1999) (*quoting United States v. Ajmal*, 67 F.3d 12, 15 (2d Cir. 1995)). In the interest of preserving a defendant's constitutional rights to be tried before a neutral finder of fact, "written rules are necessary to secure 'uniformity in procedure' and 'fairness in administration' in a trial court consisting of nine active judges, of which only one judge will preside over any given case." *Fontaine*, 56 V.I. at 594.

Here, there were more than just the prophylactic measures employed by the trial court in the jury questioning that led to our finding of harmless error. We also find that sufficient evidence exists from which to convict Todmann, notwithstanding any error that may have occurred in allowing juror questioning. We discuss below and in detail the sufficiency of the evidence to convict Todmann. Courts have found harmless error due to sufficiency of the evidence in cases where the errors in jury questioning were more egregious than in this case. *See, e.g., United States v. Sykes*, 614 F.3d 303, 313-14 (7th Cir. 2010) (plain error was not found despite trial court's erroneous practice of allowing jurors to interrupt testimony and giving themselves free rein to ask questions of witnesses at will, because of overwhelming evidence of defendant's guilt).

Accordingly, because some procedural safeguards in the jury questioning were employed by the trial court, and because the evidence to convict was overwhelming, we conclude that the trial court's error in allowing juror questioning was harmless.

## B. Juror Dismissal

Todmann contends that Juror Number 6 should have been dismissed from the jury panel based on a question he submitted to be asked of a witness. After reviewing the question, the trial judge found the question to be inappropriate and did not ask it. Juror Number 6 submitted the following question:

> Refocusing our attention back to the heart of this case, were you aware at the time that the NOPA dated December 16, 2005 generating a second salary for Mr. Todmann was a fraudulent document based on the fact that it was generated by a forged document dated July 22, 2005, Exhibit 7?

(J.A. at 1170.)

■ A jury must refrain from prematurely deliberating in a criminal case in order to ensure the protection of a defendant's Sixth Amendment right to a fair trial as well as the defendant's due process right to have the burden remain with the government to prove the defendant's guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Todmann claims that this question indicates that Juror Number 6 already had a presumption that Todmann was guilty and had committed fraud before all the evidence were presented, and thus demonstrates that he was not impartial. Therefore, Todmann insists that the trial court abused its discretion in not removing this juror.

Title 5, section 3603(b) of the Virgin Islands Code provides that "[a]ll challenges for cause or favor, whether to the array or panel or to individual jurors, shall be determined by the court." There are, however, no Superior Court rules that provide for the removal of a seated juror. In the absence of a local court rule we consult the Federal Rules of Criminal Procedure to determine whether the trial court abused its discretion in not removing Juror Number 6. SUPER. CT. R. 7; *Dowdye v. People*, 55 V.I. 736, 754 (V.I. 2011). Federal Rule of Criminal Procedure Rule 24(c)(1) is applicable to this case because jury deliberations had not commenced at the time the defense moved to have Juror Number 6 removed. *See id.* Rule 24(c)(1) provides in pertinent part that "[t]he court may impanel up to 6 alternate jurors to replace any jurors who are *unable* to perform or who are *disqualified* from performing their duties." (Emphasis added.)

■ We have clarified that the standard applied in interpreting this rule is that "the trial judge, in [the exercise of] sound discretion, may remove a juror and replace [that juror] with an alternate . . . whenever *facts are presented* which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *Dowdye*, 55 V.I. at 754-55 (quoting *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972)) (emphasis in original).

■ When confronted with a question of juror bias, a court should examine whether the juror swore under oath that he could set aside pre-formed opinions and decide the case on the evidence presented at trial and whether this protestation of impartiality should be believed. *Hanna v. Ishee*, 694 F.3d 596, 616 (6th Cir. 2012). We must also determine if the juror holds a particular belief or opinion that would substantially prevent performance of the duties of a juror in accordance to the court's instructions and the juror's oath. *United States v. Murray*, 103 F.3d 310,

323 (3d Cir. 1997). A trial court's finding as to whether a juror can render a fair trial is accorded much deference. *Id.*; *Hanna*, 694 F.3d at 616

■ Importantly, empaneled jurors are not presumed to be prejudiced or unqualified, and it is the burden of the party seeking disqualification to demonstrate prejudice by a preponderance of the evidence. *See United States v. Soto-Silva*, 129 F.3d 340, 343 (5th Cir. 1997). However, if a juror is found to have deliberately concealed bias, partiality *may* be inferred. *Hanna*, 694 F.3d at 616 (emphasis in original). If information has not been concealed, then the movant must demonstrate actual bias. *Id.*

In *Dowdye*, we outlined what procedure needs to be established to determine whether a juror has been truthful during *voir dire* and whether he would be able to render an impartial verdict, prior to disqualifying him. 55 V.I. at 754-61. Unlike the situation in *Dowdye*, where the juror may have concealed his involvement with the Freemasons in a trial where the criminal defendant was suspected of being a Freemason, Juror Number 6 was not accused of concealing any information that would affect impartiality. Therefore, partiality is not presumed, and it is the defense's burden to sufficiently prove otherwise.

■ Likewise, this case does not involve an accusation of a juror considering extraneous information, which may also support a finding of juror partiality. Because there were no allegations or facts presented by the defense that Juror Number 6 was mendacious during *voir dire* or was influenced by some extraneous information, Todmann has not shown any basis for concluding that he could have suffered any prejudice.

■ The danger arising from premature conclusions of guilt or premature deliberations is the risk of a verdict resting on opinions formed not from evidence presented during trial, but on pre-trial dispositions or biases based upon extraneous information. *United States v. Gianakos*, 415 F.3d 912, 923 (8th Cir. 2005). In this case, there is no indication in the trial record that even if Juror Number 6 made a premature conclusion of guilt, which is not conceded, such conclusion was based upon anything other than what was presented at trial. Accordingly, there could not have been any prejudice, and Todmann's constitutional right to an impartial jury could not have been violated.

We conclude that the trial court did not err in not holding a hearing to determine whether Juror Number 6 was untruthful about whether he was capable of being impartial. We have declared that a hearing may be necessary to determine the nature of alleged dishonesty during *voir dire*

depending on whether such dishonesty is readily apparent. *Dowdye*, 55 V.I. at 756.

■ Courts faced with similar dilemmas have consistently held that such a premature conclusion by a juror is not reversible error, and that without more, juror disqualification is not necessary based upon mere suspicion or conjecture that a juror reached a premature conclusion prior to jury deliberations. In *Gianakos*, the United States Court of Appeals for the Eighth Circuit ruled that the trial court did not abuse its discretion in concluding that no action was required when a juror was overheard whispering to another juror during trial that the defendant was guilty. 415 F.3d at 921-23. While the court acknowledged the importance of the jury abstaining from premature deliberations with each other and refraining from arriving at premature conclusions about a defendant's guilt, the court determined that there could be no prejudice where there was no evidence that the juror arrived at his premature conclusion based on any extrinsic evidence but only upon the evidence heard thus far at trial. *Id.* at 923.

The Third Circuit came to a similar conclusion in *Hernandez*, a case with issues substantially similar to this one, involving the crime of hijacking of an automobile. The trial court in *Hernandez* allowed questioning of witnesses by the jurors. The defendant in *Hernandez* argued on appeal that the trial judge should have conducted a hearing with a juror who posed a question implying that the juror had already assumed that the defendant was guilty. 176 F.3d at 723. The Third Circuit opined that "there [was] nothing to suggest 'jury misconduct' other than the unsupported inference that the juror who posed the question had reached a decision about the defendant's guilt before the end of the trial." *Id.* The Third Circuit further opined that

> [t]here [was] nothing in [the] record to suggest that the juror who posed the question was motivated by anything other than a desire to know about the rear doors on the highjacked truck. We will not violate the sanctity of the jury by requiring a judge to probe into the motivation behind such an innocuous question.

*Id.*

Here, the trial court noted that during the jury selection process, Juror Number 6 indicated that he could be fair and impartial and follow the

instructions of the court.[3] (J.A. at 1171.) Todmann has not presented information sufficient to rebut the presumption of impartiality. Todmann does not suggest, nor does the record reflect, that Juror Number 6 concealed any information that would indicate partiality. Because juror impartiality is presumed, we cannot assume that Juror Number 6 was untruthful in his response to questions during *voir dire* without any evidence of juror misconduct. *See United States v. Delgado*, 668 F.3d 219, 229 (5th Cir. 2012). Accordingly, we cannot conclude that the trial court abused its discretion in not removing Juror Number 6.

## C. The evidence was sufficient to uphold the convictions on all counts except for Count VI

Todmann argues that the evidence presented by the people was insufficient to convict him of any charge in the Information. In viewing the evidence in a light most favorable to the People this argument fails for all Counts except for Count VI.

Regarding Count I's charge of obtaining money by false pretenses, Todmann claims that the People failed to sufficiently prove that Todmann had the requisite *mens rea* to establish fraud. Specifically, Todmann argues that the government failed to establish that Todmann was aware that the memorandum approving an additional salary for him and the second NOPA were fraudulent. Todmann further claims that the People failed to prove that Todmann had the specific intent required for the crime of fraud. In Count I, the People charged that Todmann fraudulently obtained an unauthorized salary by fraudulently submitting a memorandum that gave the impression that the salary was approved by the Board in violation of 14 V.I.C. § 834(2).[4] (J.A. at 20.) The statute does not define false, fraudulent representations, or what constitutes defrauding another of money or property. *See Gov't of the V.I. v. Adams-Tutein*, 47 V.I. 514, 522 (D.V.I. App. Div. 2005). Accordingly, we use the

---

[3] A transcript of the jury *voir dire* was not included in the record sent to this Court.

[4] 14 V.I.C. 834(2) states in pertinent part that:

> Whoever knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property, shall —
>
> . . . .
>
> (2) if such property or money was $100 or more in value, be imprisoned not more than 10 years.

definition of fraud that is consistent with the common law construction which establishes that "a person 'defrauds' another if he makes a representation of an existing material fact, knowing it to be false, . . . intending one to rely and under circumstances in which such person does rely to his damage." *Bowry v. People*, 52 V.I. 264, 269 (V.I. 2009). Importantly, the People are not required to submit direct evidence of fraudulent intent to sustain a conviction under the statute. *Id.*

In interpreting the evidence in a light most favorable to the People, the trial record before us confirms that there is sufficient evidence presented in which a reasonable jury could find Todmann guilty beyond a reasonable doubt. The evidence establishes that Todmann delivered to the head or director of the Division of Human Resources for processing a memorandum from him to Farrow requesting an additional salary as CFO. (J.A. 234-41.) Todmann, the Administrator and secretary to the Board who regularly attends Board meetings, must have known that a salary must be approved by the Board before it can be processed. The memorandum contained what was represented as Farrow's signature and gave the distinct impression that it had been approved by Farrow. (*Id.* at 240.) However, Farrow testified to never having seen the memorandum prior to the Department of Justice's investigations and never having authorized the memorandum's contents. Farrow further testified that the signature on the memorandum was not his signature. Neither Farrow nor any other witnesses who were Board members at the time the memorandum was generated authorizing an additional salary to Todmann as CFO testified to having had any prior knowledge that Todmann was receiving two salaries or any knowledge of the memorandum. The jury heard testimony that even if Farrow had knowledge of the memorandum he was not authorized to approve its contents without a vote from the Board.

██ No board member, including Farrow, was aware of the additional salary Todmann was receiving, and none had authorized the additional salary. If the testimonies of the former Board members and the GERS employees are to be believed as true, then these testimonies confirmed that the only executive or officer of the GERS to have been aware of the memorandum authorizing an additional salary for Todmann was Todmann himself. Crucially, Todmann is not authorized to give himself an additional salary. (J.A. at 203.) Although no direct evidence of Todmann's fraudulent intent was submitted, a strong circumstantial inference drawn

from the evidence presented at trial is that Todmann knowingly submitted the memorandum to payroll for processing, knowing its authorization to be false with the intent to defraud the GERS of a salary not authorized by the proper officials on the Board of the GERS. Accordingly, the evidence presented at trial was more than sufficient for a reasonable jury to establish the elements of Count I.

██ The evidence is also sufficient for a reasonable jury to find Todmann guilty of Counts II and III. Count II accuses Todmann of submitting a forged assurance or obligation of money to wit, a 2007 proposed budget, listing the CFO position as "vacant" in violation of 14 V.I.C. § 791(2).[5] Similarly Count III charges that Todmann falsified the 2007 proposed budget in an attempt to defraud the GERS and fraudulently concealed that he was receiving two salaries in violation of 3 V.I.C. § 724(a).[6] Todmann contends that the People failed to prove that there was a forgery, that Todmann had knowledge that the proposed budget was false, and that the approval for the NOPA and the resulting NOPA were not genuine. As we discussed above, the evidence is sufficient for a reasonable jury to find that Todmann fraudulently obtained the additional CFO NOPA and salary. The evidence is also sufficient to prove that Todmann submitted a falsified budget report with the intent to defraud the GERS.

---

[5] 14 V.I.C. § 792 states in pertinent part that:

Whoever

. . . .

(2) has or keeps in his possession any blank or unfinished note or bank bill made in the form or similitude of any promissory note or bill for payment of money or property made to be issued by any incorporated bank or banking company with intention to fill and complete such blank and unfinished note or bill, or to permit or cause, or procure the same to be filled up and completed, in order to utter or pass the same, or to permit or cause, or procure the same to be uttered or passed, or to defraud any person — shall be fined not more than $2,000 or imprisoned not more than 10 years, or both.

[6] 3 V.I.C. § 724(a) states in pertinent part that:

Any person who knowingly makes any false statement, or falsifies or permits to be falsified any record of this system, in an attempt to defraud the system, is guilty of a felony, and on conviction shall be fined not less than $25,000 nor more than $100,000 and imprisoned not less than five years, without suspension, modification, or revocation of the sentence prescribed herein, nor more than ten years.

As the Board's treasurer and acting CFO, Todmann was responsible for a treasurer's report of expenditures and income, as well as the preparation of an annual proposed fiscal year budget. (J.A. at 398, 452.) The budget includes a list of employees' salaries. During trial, the jury heard testimony that positions listed in the budget as "vacant" gave an assurance that no salaries were allocated for those positions, and that the funds for the vacant or unfilled positions were available. (J.A. at 799.) Although he was receiving a full CFO salary, Todmann prepared and submitted a budget reflecting the CFO position as "vacant." Todmann implies that the listing of the CFO position as "vacant" was not done out of fraudulent intent, but rather out of GERS' procedure of listing positions as vacant until they are permanently filled. (Br. of Appellant 13-14.) Todmann's assertion is disingenuous. There was testimony that a position is not normally listed as "vacant" where someone is collecting a full salary for the position as Todmann was doing. (J.A. at 795-99.) The jury heard testimony that a position listed as "vacant" denotes that no salary is being earned for that position. The members of the Board understood that the description of the CFO position as "vacant" meant that no salary or compensation was being paid for that position. (*Id.*) Accordingly, the trial record before us establishes that there was enough evidence presented for a reasonable jury to find Todmann guilty of these two counts.

■■■ In regards to the charge of grand larceny in Count V, Todmann maintains that "larceny cannot root in earned salary-compensation for needed work actually performed." (Br. of Appellant at 15.) This argument is fallacious. Here, it is inconsequential whether Todmann believed he was taking his rightful compensation for extra services performed. The crux of the matter is that Todmann knowingly, duplicitously, and unlawfully gave himself an additional compensation couched as a "salary" without any lawful authorization from the Board. The evidence presented at trial failed to reveal that there was any agreement between Todmann and the Board authorizing him to receive an additional compensation for his duties as CFO, but that he would perform the CFO duties and only collect his salary as Administrator. The record substantially confirms that a reasonable jury could find that Todmann unlawfully obtained funds that were beyond what was agreed upon by him and the Board. Importantly, if the evidence presented at trial discloses the unauthorized taking of funds, it is inconsequential whether the funds taken were consistent with the additional work performed as CFO. *See*

*People v. Palmeri*, 35 Misc. 3d 25, 942 N.Y.S.2d 759, 762 (N.Y. App. Div. 2012).

Although we hold that the evidence presented was sufficient for a reasonable jury to convict Todmann of Counts I, II, III, and V, we conclude that the evidence was insufficient for a reasonable juror to convict him on Count VI. Count VI charges that Todmann obtained money by false pretenses by obtaining goods and services using a Diners Club corporate credit card issued on the credit of the GERS without authorization from the GERS in violation of 14 V.I.C. § 834(2).

■■■ To reiterate, fraud under 14 V.I.C. § 834 is established where a person "makes a representation of an existing material fact, knowing it to be false, . . . intending one to rely and under circumstances in which such person does rely to *his damage*." *Bowry*, 52 V.I. at 269 (citing *People v. Adams-Tutein*, 47 V.I. 514, 522 (D.V.I. App. Div. 2005) (emphasis added). However, to prove damages, the People need not introduce evidence of an actual monetary loss; rather, the People must only prove that the fraud resulted in the victim "confer[ring] something of value to the person making the misrepresentation." *Adams-Tutein*, 47 V.I. at 523. It is evident that the GERS suffered damages in regards to Todmann's fraudulent conduct as charged in Counts I-III, because the GERS suffered monetary loss due to the unauthorized additional salary that Todmann received. It is not so evident, however, that damages were suffered because of Todmann's fraudulent conduct as charged in Count VI.

When viewing the evidence in a light most favorable to the people, the record confirms that Todmann did obtain the Diners Club credit card on the credit of the GERS without the approval or knowledge of the GERS. The record also discloses that without the knowledge of the GERS and against the policy of the Diners Club card account Todmann continued to retain and use the Diners Club card well after his employment with the GERS had ceased.

GERS credit cards can only be issued and authorized upon a resolution by the Board. (J.A. at 665.) There was no resolution authorizing Todmann to obtain a Diners Club credit card on GERS' credit. (*Id.*) Todmann instructed the Director of Accounting, his subordinate, to sign the corporate authorization section on the application for the card. (J.A. at 994-98.) The Director testified that she did not know what she was signing. (*Id.*) In accordance with GERS policy, a board member would have been the individual authorized to sign and approve the Diners Club

Card after agreement and a resolution of the Board. However, there was no board member that testified to having any knowledge of the Diners club credit card.

Todmann failed to cancel the Diners Club card after he terminated his employment with GERS despite the credit card company's policy that he do so. Further, he changed the address on the account of the Diners Club credit card from the GERS' address to his personal address after he ceased working at the GERS. (*Id.* at 544.) There is sufficient testimony in the record from which a reasonable jury can confirm that Todmann did surreptitiously obtain the Diners Club corporate credit card on GERS' credit without GERS approval or authorization.

However, the evidence is lacking to confirm that any damages occurred as a result of this fraud, whether through losses suffered by another party, or through Todmann receiving a benefit. GERS never paid any of the charges made on the Diners Club card. (J.A. at 656.) There was no testimony to verify that the GERS, the card issuer, or any vendor suffered any permanent loss or damage from Todmann's fraudulent acquisition and use of the credit card. And while it is possible that holding certain credit cards may confer the user with non-monetary benefits, such as the perception of higher social status or earning rewards points, the People introduced no evidence that possessing or using the Diners Club card conferred Todmann with any such benefits. Because no evidence was presented at trial from which a reasonable jury could find the element of damages, in accordance with the definition of fraud applicable to 14 V.I.C. § 834 that we highlighted in *Bowry*, the conviction on Count VI of the Information must be vacated.[7] *See Bowry*, 52 V.I. at 269.

## V. CONCLUSION

We conclude that the trial court abused its discretion in allowing jury questions without giving counsel for the parties the opportunity to object to these questions outside the purview of the jury, and in the absence of

---

[7] In reaching our decision, we recognize that unauthorized use of a government credit card is a crime, see 14 V.I.C. § 3004a, as is making a false statement in order to procure the issuance of a credit card, see 14 V.I.C. § 3002, and that neither of these offenses requires proof of damages. However, the People did not charge Todmann with violating sections 3002 or 3004a, which are offenses punishable only as misdemeanors; instead, the People elected to charge him with obtaining property by false pretenses, a felony that does require proof of damages.

standardized court rules and policy that uniformly regulate the practice. Nonetheless, this error was harmless because some procedural safeguards were employed and because the evidence to convict Todmann was overwhelming. The trial court did not abuse its discretion in failing to remove Juror Number 6 because Todmann presented no facts that proved that Juror Number 6's ability to perform his duty was impaired.

We find the evidence sufficient to support Todmann's convictions for Counts I, II, III, and V. However, we find the evidence insufficient to convict him of Count VI because the People failed to verify that there was any damage that occurred to the GERS because Todmann fraudulently obtained a credit card on GERS' credit. For the reasons elucidated above, we AFFIRM the convictions for Counts I, II, III, and V and VACATE the conviction for Count VI.